No. 22-2870
Criminal

# In the United States Court of Appeals
# For the Eighth Circuit

UNITED STATES OF AMERICA,

APPELLEE,

V.

EDELL JACKSON,

APPELLANT.

*Appeal from the
United States District Court for the
District of Minnesota*

**BRIEF OF APPELLEE**

ANDREW M. LUGER
   *United States Attorney*

DAVID M. GENRICH
   *Assistant U.S. Attorney*

*U.S. Attorney's Office
District of Minnesota
600 U.S. Courthouse
300 South Fourth Street
Minneapolis, MN 55415
(612) 664-5600*

Attorneys for Appellee

# SUMMARY OF THE CASE

In January 2021, Edell Jackson armed himself with a loaded 9mm semi-automatic handgun. During an argument with a woman, he fired the gun at her, and she called 911. When law enforcement located Jackson in a parked car, Jackson attempted to flee, first by car and then on foot. During the foot chase, Jackson discarded his jacket with the gun in one of its pockets. Jackson, who had eleven felony convictions at the time, was arrested and indicted for possessing a firearm as a felon. A jury convicted him, and the district court sentenced him to 108 months' imprisonment.

Jackson makes two claims on appeal. First, he argues the district court abused its discretion in formulating its jury instructions. Second, he asserts that the felon-in-possession statute is unconstitutional as applied to him. If the Court conducts oral argument in this matter, the government respectfully suggests that fifteen minutes is sufficient.

Appellate Case: 22-2870    Page: 2    Date Filed: 02/27/2023 Entry ID: 5249213

# TABLE OF CONTENTS

SUMMARY OF THE CASE........................................................................i

TABLE OF AUTHORITIES ..............................................................iv

STATEMENT OF THE CASE........................................................2

I.    Factual Background ............................................................ 2

II.   Procedural History...........................................................7

    A.   Indictment.............................................................7
    B.   Trial.......................................................................7
        1.   Testimony ..................................................7
        2.   Jury Instructions.................................... 8
        3.   Jury Questions ..................................... 17
        4.   Verdict.................................................. 18
        5.   Post-Conviction Motion To Dismiss the Indictment ............................................ 18

    C.   Sentencing ......................................................... 19

SUMMARY OF THE ARGUMENT .................................................22

ARGUMENT ....................................................................................24

I.    This Court Should Reject Jackson's Instructional Claims. ......24

    A.   Elements Of The § 922(g)(1) Offense...............................24
    B.   Predicate § 922(g)(1) Convictions And The Restoration Exclusion ......................................24
    C.   The District Court Did Not Abuse Its Discretion By Declining To Instruct The Jury On The Legal Definition Of The Restoration Exclusion. .......................25
        1.   Standard Of Review ...............................................25
        2.   The District Court Did Not Abuse Its Discretion.................................................. 26

Appellate Case: 22-2870    Page: 3    Date Filed: 02/27/2023 Entry ID: 5249213

D. Jackson Waived His Claim That The Formulation Of The Mens Rea Instruction Was An Abuse Of Discretion. .......................................................... 31

  1. The District Court's Instruction ............................. 31
  2. Standard of Review ............................................. 32
  3. Jackson Waived A Challenge To The District Court's "May Consider" Formulation. .................... 32
  4. Even If The Claim Is Not Waived, The District Court's "May Consider" Formulation Was Not Plainly Erroneous. .................................................... 34

II. The District Court Correctly Rejected Jackson's Second Amendment Challenge To Section 922(g)(1). ........................... 41

  A. Standard Of Review ...................................................... 41
  B. The *Bruen* Decision ...................................................... 41
     1. *Bruen* and the Second Amendment Standard ........ 41
     2. The Supreme Court Has Not Cast Doubt On Felon-Dispossession Statutes. ............................... 43

  C. This Court Should Reject Jackson's As-Applied Challenge. ........................................................................ 45
     1. The Text Of The Second Amendment And Its Historical Context Make Plain That Convicted Felons Cannot Mount Successful Attacks on 18 U.S.C. § 922(g)(1). ............................................... 46
     2. At The Very Least, § 922(g)(1) Is Constitutional As Applied to Jackson Based on His Eleven Prior Felony Convictions, Several Of Which Are For Drug Trafficking. ............................................. 62

CONCLUSION ............................................................................... 66

Appellate Case: 22-2870    Page: 4    Date Filed: 02/27/2023 Entry ID: 5249213

# TABLE OF AUTHORITIES

## Cases

*Baze v. Rees*, 553 U.S. 35 (2008)............................................................58

*D.C. v. Heller*, 554 U.S. 570 (2008).............................................. passim

*Folajtar v. Attorney Gen.*, 980 F.3d 897 (3d Cir. 2020) ..........57, 58 62

*Hamilton v. Pallozzi*, 848 F.3d 614 (4th Cir. 2017)............................61

*In re United States*, 578 F.3d 1195 (10th Cir. 2009) .........................60

*McDonald v. City of Chicago*, 561 U.S. 742 (2010)............ 43, 44, 47 56

*Medina v. Whitaker*, 913 F.3d 152 (D.C. Cir. 2019) .................. passim

*New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022) ................................................................................ passim

*Range v. Attorney General*, 53 F.4th 262, 266 (3d Cir. 2022) (per curiam), *vacated upon granting of rehearing en banc*, 56 F.4th 992 (3d Cir. 2023) .........................................................................53, 62

*Rehaif v. United States*, 139 S. Ct. 2191 (2019).......................... passim

*Spencer v. Kemna*, 523 U.S. 1 (1998) ...............................50, 56, 57, 58

*United States v. Adams*, 914 F.3d 602 (8th Cir. 2019)................48, 63

*United States v. Beckham*, 917 F.3d 1059 (8th Cir. 2019) ................26

*United States v. Bena*, 664 F.3d 1180 (8th Cir. 2011)............48, 49, 56

Appellate Case: 22-2870    Page: 5    Date Filed: 02/27/2023 Entry ID: 5249213

*United States v. Boaz*, 558 F.3d 800 (8th Cir. 2009) ........................27

*United States v. Broadnax*, 601 F.3d 336 (5th Cir. 2010) .................27

*United States v. Brown*, 436 F. App'x 725 (8th Cir. 2011) .....45, 46, 63

*United States v. Burning Breast*, 8 F.4th 808 (8th Cir. 2021)....35, 36, 37, 38

*United States v. Burris*, 22 F.4th 781 (8th Cir. 2022) ........................64

*United States v. Coleman*, 961 F.3d 1024 (8th Cir. 2020) .................24

*United States v. Davis*, 826 F.3d 1078 (8th Cir. 2016) .......................32

*United States v. Greaves*, __ F. Supp.3d __, 2023 WL 1791866 (M.D. Tenn. Feb. 6, 2020) .........................................................................45

*United States v. Haynie*, 8 F.4th 801 (8th Cir. 2021) .........................25

*United States v. Hughley*, 691 F. App'x 278 (8th Cir. 2017) ......passim

*United States v. Irish*, 285 F. App'x. 326 (8th Cir. 2008) ..................44

*United States v. Joos*, 638 F.3d 581 (8th Cir. 2011) ..........................44

*United States v. Lomax*, 87 F.3d 959 (8th Cir. 1996) .........................38

*United States v. Magallon*, 984 F.3d 1263 (8th Cir. 2021).................25

*United States v. McCane*, 573 F.3d 1037 (10th Cir. 2009) ................61

*United States v. Miller*, 678 F.3d 649 (8th Cir. 2012) ........................27

*United States v. Mink*, 9 F.4th 590 (8th Cir. 2021) ...........................39

Appellate Case: 22-2870    Page: 6    Date Filed: 02/27/2023 Entry ID: 5249213

*United States v. Navarrete-Barron*, 192 F.3d 786 (8th Cir. 1999)......64

*United States v. Pazour*, 609 F.3d 950 (8th Cir. 2010)......................38

*United States v. Pickens*, 58 F.4th 983 (8th Cir. 2023) ..........32, 33, 34

*United States* v. *Rahimi*, 2023 WL 1459240 (5th Cir. Feb. 2, 2023) .62

*United States v. Reed*, 636 F.3d 966 (8th Cir. 2011) ..........................32

*United States v. Robinson*, 982 F.3d 1181 (8th Cir. 2020)....35, 37, 38, 39

*United States v. Rozier*, 598 F.3d 768 (11th Cir. 2010)......................61

*United States v. Scroggins*, 599 F.3d 433 (5th Cir. 2010) ..................60

*United States v. Siegrist*, 595 F. App'x 666 (8th Cir. 2015)...44, 45, 63, 64

*United States v. Stanko*, 431 F.3d  (8th Cir. 2007).....................passim

*United States v. Vongxay*, 594 F.3d 1111 (9th Cir. 2010) ..................61

*United States v. Williams*, 24 F.4th 1209 (8th Cir. 2022)............44, 45

*United States v. Woolsey*, 759 F.3d 905 (8th Cir. 2014) ....44,45, 46, 63

*United States v. Seay*, 620 F.3d 919 (8th Cir. 2010).....................41, 44

Appellate Case: 22-2870     Page: 7     Date Filed: 02/27/2023 Entry ID: 5249213

**Statutes**

1 *Public Acts of the General Assembly of North Carolina* (1804) ......54

1 W. & M., Sess. 1 & 2, in 6 *The Statutes of the Realm* (1688)....51, 52

2 *Laws of the State of New York Passed at the Sessions of the*

    *Legislature (1785-1788)* (1886) ......................................................58

5 *The Acts and Resolves, Public and Private, of the Province of the*

    *Massachusetts Bay* (1886) .............................................................54

7 *Records of the Colony of Rhode Island and Providence Plantations*

    *in New England* (1862) .................................................................54

7 *The Statutes at Large; Being A Collection of All the Laws of*

    *Virginia* 35-39 (1820) ....................................................53, 54, 59

9 *The Statutes at Large; Being a Collection of All the Laws of*

    *Virginia, from the First Session of the Legislature* 302-03 (1821)..59

18 U.S.C. § 921(a)(20) ................................................................ passim

18 U.S.C. § 922(g)(1) ................................................................. passim

1777 Pa. law .......................................................................................55

*A Digest of the Laws of Maryland* 255-56 (1799) ..............................59

*Acts of the General Assembly of the State of New-Jersey at a Session*

    *Begun on the 27th Day of August, 1776* (1777) ..............................54

Appellate Case: 22-2870    Page: 8    Date Filed: 02/27/2023    Entry ID: 5249213

Mass. Const. of 1780 ............................................................ 55

Minn. Stat. § 624.712 ..................................................... passim

Minnesota Statute § 624.714 ............................................... 63

*The Public Records of the Colony of Connecticut From May, 1775 to*

*June, 1776* (1890) ........................................................ 53

9 *The Statutes at Large; Being A Collection of All the Laws of*

*Virginia* (1821) .......................................................... 54

*Statutes at Large of Pennsylvania from 1682 to 1801* (1903) ..... 54, 55

## Other Authorities

4 William Blackstone, *Commentaries on the Laws of England* (1769)

.................................................................... 48, 57

4 *Journals of the Continental Congress 1774-1789* (1906) ............... 54

Akhil Reed Amar, *The Bill of Rights* (1998) ..................... 50, 56, 57

Beth A. Colgan, *Reviving the Excessive Fines Clause*, 102 Cal. L. Rev.

277 (2014) ............................................................ 58

Eighth Circuit Model Criminal Jury Instruction 6.15 ...................... 34

Eighth Circuit Model Criminal Jury Instructions 9.08A ................... 37

*Reviving the Excessive Fines Clause*, 102 Cal. L. Rev. 277 ............... 58

Appellate Case: 22-2870     Page: 9     Date Filed: 02/27/2023 Entry ID: 5249213

The Complete Bill of Rights: The Drafts, Debates, Sources, And Origins 278 (Oxford University Press 2d ed., 2014) ...................55

Thomas M. Cooley, *A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union* (1st ed. 1868) ......................................................…….49, 50, 56, 57

Appellate Case: 22-2870     Page: 10     Date Filed: 02/27/2023 Entry ID: 5249213

## <u>STATEMENT OF THE ISSUES</u>

I.   **A.** **Did the district court abuse its discretion by declining to instruct the jury on the legal definition of 18 U.S.C. § 921(a)(20)'s restoration exclusion when whether the exclusion applies is a matter of law for the court?**

      *United States v. Stanko*, 431 F.3d 408 (8th Cir. 2007)

    **B.** **Did Jackson waive his second instructional claim when he agreed to the formulation he now challenges?**

      *United States v. Pickens*, 58 F.4th 983 (8th Cir. 2023)

    **If not waived, did the district court plainly abuse its discretion in instructing the jury that it may consider whether Jackson reasonably believed that his civil rights had been restored, including his right to possess a firearm, in resolving § 922(g)(1)'s mens rea element?**

      *United States v. Burning Breast*, 8 F.4th 808 (8th Cir. 2021)
      *United States v. Robinson*, 982 F.3d 1181 (8th Cir. 2020)

II.  **Did the district court err in denying Jackson's as-applied challenge to § 922(g)(1) when § 922(g)(1) is constitutional in all its applications and, at the very least, as applied to Jackson?**

      *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022)
      *United States v. Bena*, 664 F.3d 1180 (8th Cir. 2011)
      *United States v. Hughley*, 691 F. App'x 278 (8th Cir. 2017)

1

## STATEMENT OF THE CASE

## I.    Factual Background

In early 2021, police received a 911 "shots fired" call from A.W., an adult woman. (Trial Transcript ("TT"), Vol. II at 47, 120-22.) Jackson had punched and kicked her multiple times during an argument. (PSR ¶ 6.)[1] After Jackson knocked her to the ground, he fired a gun at her, almost hitting her foot. (*Id.*) Jackson then fled in his car. (*Id.*)

Officers responded to the scene and observed visible injuries to A.W.'s face and arms. (*Id.* at ¶ 7.) Officers located Jackson shortly thereafter sitting in the driver's seat of his car in the parking lot of an apartment building. (TT, Vol. II at 56, 58-59.) Officers attempted a felony stop, but Jackson put his car in reverse and tried to flee. (*Id.* at 60-61.) He hit a snowbank, however, and officers disabled his vehicle by striking it with an unmarked squad. (*Id.* at 61-63.) Undeterred, Jackson got out the passenger side and fled on foot. (*Id.* at 63-65, 162-63.) Jackson shed his jacket and dropped it during his flight. (*Id.* at

---

[1] The portion of the PSR recounting the details of the assault was adopted by the district court over Jackson's objection. (R. Doc. 125, at 9.)

Appellate Case: 22-2870    Page: 12    Date Filed: 02/27/2023 Entry ID: 5249213

65, 88, 163-64.) Ultimately, officers caught Jackson and arrested him. (*Id.* at 65-66.)

Other officers retrieved the jacket Jackson had discarded. They found a loaded Bersa 9mm semi-automatic handgun in a pocket. (*Id.* at 93, 126-31, 167, 210; Gov't Exh. 32.)[2] DNA recovered from the firearm matched Jackson. (*Id.* at 287-89, 305-07.)

In addition to dropping the gun while fleeing police, Jackson made statements to A.W. after his arrest that demonstrated he knew he was prohibited from possessing a firearm. In one jail call, Jackson assured her that he "didn't have my jacket on" when he was arrested. (Gov't Exh. 27 at 17:16 (excerpted recording of call, full recording Gov't Exh. 36).) Jackson emphasized the importance of having shed his jacket, telling A.W. "[y]ou know what the fuck was in my jacket." (*Id.*)

In a second call, Jackson became angry with A.W. when she told him that she had given the police the passcode to Jackson's iPhone, which officers had recovered from Jackson's car. (TT, Vol. I at 180

---

[2] The government's non-physical trial exhibits will be put on an unencrypted USB card and submitted to the Court with the paper copies of the brief.

(recovery of iPhone); Gov't Exh. 28 at 5:37 (excerpted recording of second call).) On the iPhone, Jackson had a photograph of the same handgun, identified by its serial number visible in the photograph, that had been recovered from his jacket. (TT, Vol. I at 188-196, 210-12; Gov't Exhs. 21, 24A, 24B, 25.) Jackson told A.W. that by giving the police access to the contents of his iPhone, "Fuck. I'm gone," "[t]hat might have buried me," "you really just killed me," "I'm going federal," and "I'm going down." (Gov't Exh. 28.)

At the time he possessed the firearm, Jackson had two felony drug-sale convictions in Minnesota. (TT, Vol. II at 218-23.) Certified copies of both convictions were admitted at trial. (*Id.*; Gov't Tr. Exhs. 29, 30 (certified copies of Minnesota convictions).) The first conviction was in August 2011 for Drugs, Second Degree Sale, and he was sentenced to 78 months' imprisonment. (TT, Vol. II at 219-22; Gov't Exh. 29.) The second conviction was in 2012, also for Drugs, Second Degree Sale, and he was sentenced to 144 months' imprisonment. (TT, Vol. II at 222-23; Gov't Exh. 30.)[3]

---

[3] In addition to the convictions proven at trial, Jackson had seven felony drug convictions and a felon in possession of firearm conviction in the State of Illinois. (PSR ¶¶ 33, 38-43.)

Appellate Case: 22-2870    Page: 14    Date Filed: 02/27/2023 Entry ID: 5249213

Jackson admitted at trial that he knowingly possessed the Bersa 9mm firearm. (TT, Vol. III at 335, 338.) He claimed he did not run from officers or take off his jacket in an effort to avoid being found with the gun. (*Id.* at 363-64.) Rather, he asserted he ignored commands to put his hands up—and ran instead while shedding his jacket—so he would not get shot by officers. (*Id.* at 363.) Further, he suggested that when he told A.W. in a recorded call that he "wasn't wearing his jacket" and that she "knew the fuck what was in" the jacket, he was referring to marijuana rather than the gun. (*Id.* at 366-67.) He asserted that when he said he was "done" and "going federal" when he learned the police had access to the contents of his phone, he was worried about pictures of marijuana that would be found on the phone, not the picture of him holding the same handgun that was recovered from his jacket. (*Id.* at 370-71.)

Jackson also testified that he had been convicted of the two Second Degree Sale felony drug offenses in 2011 and 2012 and served years in prison. (*Id.* at 325-27.) He stated that after being released from prison in Minnesota in 2017, he was assigned a parole officer for a period of three years. (*Id.* at 327-28.) He said that when discharged

5

from supervision in August 2020, the parole officer brought discharge papers to him. (*Id.* at 330). Jackson testified that he and his parole officer met outside, where he signed discharge papers on the hood of a car. (*Id.* at 330.) Jackson claimed that the parole officer told him that his civil rights had been restored, he was no longer a felon, and that he could "register to vote and do everything else as a productive member of society." (*Id.* at 331, 340.) He said he was not given any specific instruction that he could not possess firearms. (*Id.*) Jackson asserted that as a result, he believed he was lawfully permitted to possess firearms. (*Id.* at 337.) He testified that he went to a training class required for a permit to carry a firearm in Minnesota. (*Id.* at 332-33.)

In its rebuttal case, the government admitted a copy of Jackson's discharge papers provided to him upon expiration of his sentence. (TT, Vol. IV at 478; Gov't Exh. 34 ("Notice of Sentence Expiration and Restoration of Civil Rights").) The discharge papers advised that the individual's civil rights had been restored, discussing voting rights with specificity, but that "[t]he Department of Corrections is not responsible for determining the eligibility of a person to ship,

6

transport, possess, or receive a firearm." (TT, Vol. IV at 479; Gov't Exh. 34.) Rather, the discharge papers stated that "[i]f you need assistance to determine your legal rights, please obtain private counsel." (TT, Vol. IV at 479; Gov't Exh. 34.) Further, the discharge provided that "if you have been convicted of a crime of violence under Minnesota Statute 624.712, Subdivision 5, you cannot ship, transport, possess, or receive a firearm for the remainder of your lifetime." (TT, Vol. IV at 479.) Jackson's two Minnesota drug-trafficking convictions are crimes of violence that prohibit firearms possession for life, and the jury was so instructed. (R. Doc. 65, at 13 (Jury Instruction).)

## II.  Procedural History

### A.  Indictment

In February 2021, Jackson was indicted in the District of Minnesota on one count of possessing a firearm as a felon in violation of 18 U.S.C. §§ 922(g)(1) and 924(e). (R. Doc. 6.)

### B.  Trial

#### 1.  Testimony

The district court conducted a five-day jury trial in March 2022. (R. Doc. 120 (Trial Transcript, Day 1); R. Doc. 121 (Day 2); R. Doc. 122 (Day 3); R. Doc. 123 (Day 4); R. Doc. 117 (Day 5).)

7

## 2. Jury Instructions

Prior to trial, the parties submitted proposed jury instructions to the court. (R. Doc. 51; R. Doc. 53.) Jackson did not offer any instructions bearing on his alleged belief he was entitled to possess a firearm. (R. Doc. 53, at 30.) After Jackson testified and alleged that he believed he could possess a firearm based upon a conversation with his supervising officer, the district court discussed the nature of Jackson's claimed defense with the parties. (TT, Vol. III at 377-400.) Jackson stated that under 18 U.S.C. § 921(a)(20), which defines a "conviction" for purposes of § 922(g)(1), any conviction for which a person has had his civil rights restored is disqualified as a § 922(g)(1) predicate. (*Id.* at 380.) He also stated that what Jackson believed about the restoration of his rights was a mens rea defense, whether or not his civil rights had actually been restored. (*Id.* at 381.) The government asked for time both to contact Jackson's probation officer[4] as a possible rebuttal witness and to review whether Jackson had a viable

---

[4] Although Jackson referred to his supervising officer as a "parole" officer, she was actually a probation officer.

8

reasonable-mistake-of-fact defense and, if so, its parameters. (*Id.* at 377-79, 381-83.)

After a short recess, the government reported that it had contacted Jackson's probation officer, who said she had met with Jackson in August 2022 but had not told him he was no longer a felon or was otherwise eligible to possess a firearm. (*Id.* at 391.) The probation officer, based in Duluth, was not available to come to Minneapolis to testify because she needed to be with a close relative who was about to pass away. (*Id.*) The government stated that in its rebuttal case it would offer Jackson's discharge papers, which expressly provided that the Department of Corrections was not responsible for determining the eligibility of a person to possess a firearm. (TT, Vol. III at 391; Gov't Exh. 34.)

The district court then discussed with the parties the distinction between whether Jackson had actually had his civil rights restored, to include possession of a firearm, and his alleged subjective belief, even if mistaken, that his civil rights were restored, to include firearm possession. (TT, Vol. III at 392-99, 408.) The government stated that whether Jackson had actually had his rights restored, to include

9

firearms possession, as to the felony predicates offered by the government was a question of law for the district court. (*Id.* at 410-11.) The government asserted that a mistaken belief that one's right to possess a firearm had been restored was not a defense. (*Id.* at 415-16.) Jackson responded that he was not guilty as a matter of law because his civil rights had been restored and "he was no longer a prohibited person" and "as a matter of law, he doesn't fit the definition." (*Id.* at 418-19.) He also argued that even if he were mistaken about whether he could legally possess a firearm, his subjective belief was a defense to § 922(g)(1)'s mens rea element. (*Id.*) He asked the district court in its instructions to provide the jury with the statutory definition of § 921(a)(20)'s restoration exclusion and to allow him to argue that the two felony predicates admitted at trial were legally disqualified under the exception and that he did not have the requisite mens rea. (*Id.* at 424.)

The district court responded that it believed the issue of whether Jackson's felony convictions were actually disqualified as § 922(g)(1) predicates under the restoration exclusion was a "purely legal issue," separate from a possible defense of whether Jackson mistakenly

Appellate Case: 22-2870     Page: 20     Date Filed: 02/27/2023 Entry ID: 5249213

believed his rights were restored such that he was permitted to possess firearms. (*Id.* at 425.) After the parties reiterated their positions (*Id.* at 425-30), the district court indicated it would make its ruling that evening and communicate it to the parties via email. (*Id.* at 430.)

> That evening, the district court emailed the parties its ruling:
>
> Consistent with the Court's proposed instructions, the Court finds that the question of whether the Defendant is a felon is a question of law, not fact, and that ignorance of the law is not a defense.
>
> However, the Court will allow argument that based upon the Defendant's reliance on the probation officer, the Defendant believed that he was no longer a convicted felon.
>
> During the charge conference, the Court will discuss with the parties the proposed jury instructions and the scope of closing arguments.

(Jackson Add. 8.)

The following day, the district court reviewed with the parties Minnesota state law as to the restoration of civil rights, including the right to possess a firearm. (TT, Vol. IV at 434-36.) The district court noted that Minnesota law provides that a person convicted of a crime of violence as defined by Minnesota Statutes section 624.712,

Appellate Case: 22-2870    Page: 21    Date Filed: 02/27/2023 Entry ID: 5249213

subdivision 5 cannot possess a firearm for the remainder of his or her lifetime. (*Id.* at 434-36; Gov't Exh. 34 (lifetime prohibition for crime of violence convictions noted on Jackson's discharge papers).) The district court further noted that Jackson was subject to that lifetime prohibition because his two Minnesota drug-trafficking felonies were crimes of violence under section 624.712. (TT, Vol. IV at 434-36.)

At that point, Jackson acknowledged that he was "not entitled to have my motion granted under Rule 29" because his convictions were Minnesota crimes of violence and thus his right to possess a firearm had not been restored. (*Id.* at 437.) He said the question remaining was what he reasonably believed, even though mistakenly, based upon his conversation with the probation officer. (*Id.* at 438.)

After that discussion, the district court turned to the "parameters of closing argument and the jury instructions." (*Id.* at 438.) After further argument from the parties about whether Jackson's assertion that he believed, albeit mistakenly, he could possess a firearm was a defense to § 922(g)(1)'s mens rea element, the district court stated that it would allow Jackson's subjective mens rea argument to go to the jury. (*Id.* at 448-50.) Jackson agreed that the

12

issue was not whether Jackson actually could possess a firearm, but whether he believed, even if mistakenly, that his rights had been restored such that he could. (*Id.* at 451-52.) The district court then indicated it would create a draft instruction for the parties' review and input. (*Id.* at 452-53.)

Following the government's rebuttal case, the district court discussed the final instructions with the parties. (*Id.* at 489-505.) As to the mens rea element, the district court suggested that the jury be instructed that the government must prove, as an element of the offense, that Jackson "knew he had been convicted of a crime punishable by imprisonment for more than one year or he could not reasonably believe that his civil rights had been restored, including his right to possess a firearm." (*Id.* at 493, 496.)

Jackson proposed an alternative. Jackson suggested that the jury be instructed that the mens rea element required the government to prove that he "knew he had been convicted of a crime punishable by imprisonment for more than one year." (*Id.* at 497.) With that as the element, Jackson then proposed that, "in your definitional paragraph," the district court would instruct:

13

> For you to find that Element 3 is proved beyond a reasonable doubt, you must unanimously agree that the defendant knew he had been convicted of a crime punishable by imprisonment for more than one year at the time he knowingly possessed the firearm described in the Indictment.

(*Id.* at 497-98.) After that sentence, Jackson recommended that the district court insert:

> In making that determination, you may consider whether he reasonably believed that his civil rights had been restored at the time he knowingly possessed the firearm described in the Indictment.

(*Id.* at 498.) The district court asked Jackson to repeat his suggested instruction. (*Id.* at 498-99.) Jackson did so. (*Id.*)

The government agreed with the suggestion, adding the request that the phrase "including the right to possess a firearm" be added to "whether he reasonably believed his civil rights had been restored." (*Id.* at 498.) Jackson objected to including the phrase, "including his right to possess a firearm." (*Id.* at 494, 495, 499-500.) He instead proposed adding to the agreed-upon "[y]ou may consider whether he reasonably believed his civil rights had been restored" the phrase, "and he was no longer a felon." (*Id.* at 501-02.)

14

After a short break, the district court circulated another draft of the instructions, which included the formulation that the jury "may consider whether the defendant reasonably believed his civil rights had been restored, including his right to possess a firearm" in determining whether the government has proven the mens rea element of the offense. (*Id.* at 504.) Jackson stated that the instruction allowed him to make an argument he had thought was foreclosed, namely an assertion that "he reasonable believed he could possess firearms." (*Id.* at 504.) The district court agreed he would be permitted to make that argument, and Jackson replied, "Okay." (*Id.* at 504-05.) After confirming there was nothing further from the government, the district court distributed the final instructions to the parties and proceeded to closing arguments. (*Id.* at 505.)

In closings, both parties focused on mens rea. The government argued that Jackson first tried to flee in his car and then ran from police and ditched his jacket with the gun in it because he knew he was prohibited from possessing a firearm. (*Id.* at 511-17, 535-38.) The government reviewed Jackson's statements in recorded jail calls that he was not wearing his jacket with "you know what" inside when

15

arrested and that police access to his phone, which contained a photograph of him holding the Bersa handgun, meant he was "going federal" and "going down." (*Id.* at 538-40.) The government also discussed how the context in which those statements were made demonstrated he was talking about a gun, not marijuana. (*Id.*)

With respect to what Jackson had been advised of by the Department of Corrections, the government went over Jackson's discharge papers, which explicitly stated that the Department of Corrections could not advise him on his right to possess firearms and that convictions for crimes of violence were subject to a lifetime possession ban. (*Id.* at 533.) In light of the evidence, the government argued that Jackson's claims about why he ran, his conversation with his probation officer, and the meaning of the recorded calls were not credible. (*Id.* at 513-17, 532-40.)

Jackson asserted that he believed he was not a felon based upon the conversation with his probation officer. (*Id.* at 522-26, 528-31.) He argued that, given he did not believe he was a felon, it was legally irrelevant whether he thought he could lawfully posses a firearm. (*Id.*) He contended the written advisories on the discharge papers were not

his responsibility to understand. (*Id.* at 525-26.) He cited the effort to get a state permit to carry as evidence he did not think he was a felon, and he dismissed his statements in the recorded calls as irrelevant to what he thought on the actual date of his arrest. (*Id.* at 529-31.)

### 3. Jury Questions

The jury asked two questions during its deliberations. (R. Doc. 68; R. Doc. 69.) First, it asked for clarification on the sentence, "[i]n making this determination, you <u>may</u> consider whether the defendant reasonably believed that his civil rights had been restored, including his right to possess a firearm." (R. Doc. 68 (emphasis in jury's original question).) It asked, "for clarity, do we have to consider this." (R. Doc. 68.) The district court responded, without objection from the parties, that "[i]t is one issue that you may consider in evaluating whether the government has proven element #3 beyond a reasonable doubt." (R. Doc. 70; TT, Vol. IV at 578-79 (neither party objecting to response).) During the colloquy with the district court about the response, Jackson acknowledged his participation in crafting the instruction, noting to the court that it one "we" came up with. (TT, Vol. IV at 579.)

Second, the jury asked later in its deliberations whether "the defendant believing that his civil rights had been restored, AND knowing that he had been convicted of a crime punishable by imprisonment for more than one year translate into having proven" the third element (namely, that "at the time the defendant knowingly possessed the firearm, he knew he had been convicted of a crime punishable for more than one year"). (R. Doc. 69 (emphasis in jury's original question).) The district court responded, over defense objection, that "[t]his is a question that you must decide based on the evidence before you and my instructions." (R. Doc. 71; TT, Vol. V at 585-86.) Jackson wanted the district court to respond "No" to the question. (TT, Vol. V at 582.)

### 4. Verdict

The jury returned a verdict of guilty. (R. Doc. 67.)

### 5. Post-Conviction Motion To Dismiss the Indictment

After trial and before sentencing, the Supreme Court issued its decision in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022). Jackson then brought a motion to dismiss the indictment, arguing that § 922(g)(1) is unconstitutional on its face and

18

as applied to him. (R. Doc. 100.) The district court denied the motion in an oral ruling from the bench at sentencing followed by a written order. (R. Doc. 125, at 4-7 (Sentencing Transcript); R. Doc. 114 (Order).) The district court concluded that this Court's precedent upholding the facial constitutionality of § 922(g)(1) remained good law after *Bruen*. (R. Doc. 114, at 2-3.) The district court further concluded that, assuming § 922(g)(1) is susceptible to as-applied challenges by felons, Jackson "has proven himself to be both dangerous and unable to abide by the law" and thus can be prohibited from possessing firearms without running afoul of the Second Amendment. (R. Doc. 114, at 4-7.)

## C. Sentencing

The United States Probation Office detailed Jackson's criminal history in the PSR prepared after trial. (R. Doc. 90, PSR ¶¶ 27-69.)[5] At the time of his January 2021 arrest, Jackson had eleven prior state-court felony convictions beginning with a drug possession offense in 1996 at the age of 18. (PSR ¶ 33.) Between 2000 and 2010, he was

---

[5] A revised PSR was filed after sentencing (R. Doc. 103) that does not differ in any material respect from the PSR used at sentencing.

convicted on six separate occasions in Illinois of felony drug offenses, including the manufacture/delivery of a controlled substance and the possession of a controlled substance with intent to deliver. (PSR ¶¶ 38-43.) He also was convicted in that same period of unlawful possession of a firearm by a felon. (PSR ¶¶ 40.) He unlawfully possessed the gun at the same time he was in possession of "several bags of crack cocaine and heroin." (PSR ¶ 40.) In 2010, he was convicted of three more drug felonies, this time in Minnesota, including two second-degree sale offenses. (PSR ¶¶ 44, 46.) On at least three occasions, Jackson fled from police on foot or in a vehicle before being apprehended by police. (PSR ¶¶ 38, 44-45.) On one occasion, he made an indirect threat of violence towards a responding officer. (PSR ¶ 45.)

On the eleven felony convictions, Jackson's terms of imprisonment included 18 months, 2 years, 6.5 years, 8 years, and 12 years. (PSR ¶¶ 39-42, 44, 46.) He was cited for dozens of disciplinary and rules violations while incarcerated in both Illinois and Minnesota. (PSR ¶¶ 40, 46.) Jackson was also revoked nine times for violations of supervised release, including failing to remain law-abiding and failing to follow standard conditions of supervision. (PSR ¶¶ 39-41, 44, 46.)

Appellate Case: 22-2870    Page: 30    Date Filed: 02/27/2023 Entry ID: 5249213

He was discharged from his last period of supervision in August 2020, only five months before his arrest in this case. (*Id.*)

The district court conducted a sentencing hearing in August 2022. (R. Doc. 104.) The district court sentenced Jackson to 108 months' imprisonment. (R. Doc. 108, Judgment.) Jackson filed a timely notice of appeal. (R. Doc. 105.)

Appellate Case: 22-2870     Page: 31     Date Filed: 02/27/2023 Entry ID: 5249213

## SUMMARY OF THE ARGUMENT

Jackson contends that the district court abused its discretion in two ways with respect to jury instructions. First, he alleges that the district court erroneously concluded that "whether the defendant is a felon is a question of law, not fact" in declining to instruct the jury on the statutory definition of § 921(a)(20)'s restoration exception. This Court should reject that claim, reviewed for an abuse of discretion, because the district court appropriately decided as a matter of law whether Jackson qualified for § 921(a)(20)'s restoration exclusion. The district court then accurately charged the jury on the post-*Rehaif* elements of a § 922(g)(1) offense. Second, Jackson argues that the district court abused its discretion by instructing that the jury that it "may consider" his mistaken belief about the restoration of his rights in determining whether the government had proven *Rehaif*'s mens rea requirement beyond a reasonable doubt. Jackson waived that claim by agreeing to that formulation and then having his position on how it should be incorporated into the instructions adopted by the district court. If not waived, the forfeited claim fails because the district court did not plainly abuse its discretion in formulating the instruction,

22

particularly in a post-*Rehaif* legal landscape that is unsettled as to Jackson's alleged mens rea defense.

Jackson also asserts that § 922(g)(1) is unconstitutional as applied to him because, he alleges, his felonies do not render him sufficiently "dangerous." This Court has not resolved whether the felon-in-possession statute is susceptible to as-applied challenges. As the district court correctly noted, § 922(g)(1) is consistent with this Court's prior review of historical scholarship, which establishes that gun restrictions were not limited to those deemed to be dangerous but were instead directed at citizens who were not law-abiding and responsible. Section 922(g)(1) is accordingly constitutional on its face and in all its applications. In any event, Jackson's eleven felony convictions—four of which are for drug trafficking and one of which is for unlawful possession of a gun—demonstrate he is more dangerous than a typical law-abiding citizen, and his challenge thus fails even under a dangerousness limitation.

Appellate Case: 22-2870    Page: 33    Date Filed: 02/27/2023 Entry ID: 5249213

# ARGUMENT

## I. This Court Should Reject Jackson's Instructional Claims.

### A. Elements Of The § 922(g)(1) Offense

A § 922(g)(1) offense has four elements: (1) previous conviction of a crime punishable by a term of imprisonment exceeding one year; (2) knowing possession of a firearm; (3) the defendant knew he belonged to the relevant category of persons barred from possessing a firearm; and (4) the firearm was in or affecting interstate commerce. *United States v. Coleman*, 961 F.3d 1024, 1027 (8th Cir. 2020); R. Doc. 224 at 16 (Jury Instruction).

### B. Predicate § 922(g)(1) Convictions And The Restoration Exclusion

For purposes of § 922(g)(1), exclusions from what constitutes a conviction for a crime punishable by imprisonment for a term exceeding one year are separately set forth in § 921(a)(20). As is pertinent here, a felony conviction for which a person had has civil rights restored is not a § 922(g)(1) predicate unless such "restoration of civil rights expressly provides that the person may not ship, transport, possess, or receive firearms." *Id.* The government refers to that exclusion herein as the "restoration exclusion."

24

The restoration exclusion is "determined in accordance with the law of the jurisdiction in which the proceedings were held." 18 U.S.C. § 921(a)(20). Here, the two felony convictions used by the government at trial as felony predicates were Minnesota convictions for second-degree drug sale. Minnesota law provides that felony drug convictions are crimes of violence and that a person convicted of those crimes cannot possess firearms for the remainder of his or her lifetime. Minn. Stat. § 624.712, subd. 5. Jackson's two Minnesota felony predicates accordingly are not disqualified as § 922(g)(1) predicates under the restoration exclusion.

### C. The District Court Did Not Abuse Its Discretion By Declining To Instruct The Jury On The Legal Definition Of The Restoration Exclusion.

#### 1. Standard Of Review

When a defendant preserves an objection to the district court's jury instructions, this Court reviews the district court's formulation of the instructions for abuse of discretion and its interpretation the law de novo. *United States v. Haynie*, 8 F.4th 801, 804 (8th Cir. 2021). "If the instructions, taken as a whole, fairly and adequately submitted the issues to the jury, [this Court] will affirm." *United States v. Magallon*, 984 F.3d 1263, 1286 (8th Cir. 2021). If the instructions were

25

erroneous, the Court applies a harmless error analysis. *United States v. Beckham*, 917 F.3d 1059, 1064 (8th Cir. 2019).

## 2. The District Court Did Not Abuse Its Discretion.

Jackson requested that the district court include in its instructions § 921(a)(20)'s statutory definition of the restoration exclusion. Trial Tr., Vol. IV at 423-24; Jackson Br. at 10, 12-13. Jackson asserts that the district court abused its discretion by declining to include the § 921(a)(20) statutory definition in the instructions. Jackson Br. 10, 12-13. The claim should be rejected because the district court correctly determined that whether Jackson's felony predicates were disqualified under the restoration exclusion was a question of law for the court, not a question of fact for the jury.

The district court correctly treated whether Jackson's felony predicates qualified for the restoration exclusion as a question of law. As this Court has squarely and repeatedly held, "[t]he definitional nature of the § 921(a)(20) exclusions places the responsibility on the court to determine as a matter of law whether the prior conviction qualifies as a 'crime punishable by imprisonment for a term exceeding one year.'" *United States v. Stanko*, 431 F.3d 408, 412 (8th Cir. 2007);

26

*see also United States v. Miller*, 678 F.3d 649, 651 (8th Cir. 2012) (same); *United States v. Boaz*, 558 F.3d 800, 805 (8th Cir. 2009) ("same); *see generally United States v. Broadnax*, 601 F.3d 336, 345 n.6 (5th Cir. 2010) (collecting cases and noting that "[t]he view that whether a conviction falls within a § 921(a)(20) definition is a legal issue is confirmed by the many holdings of our sister circuits"). Thus, whether a conviction falls within the exclusions defined in § 920(a)(20) is a "question of law for the court rather than one of fact for the jury." *Stanko*, 431 F.3d at 412.

*Rehaif* does not counsel otherwise. *Rehaif* held that § 922(g)(1) requires a defendant to know that he belonged to the relevant category of persons barred from possessing a firearm. *Rehaif v. United States*, 139 S. Ct. 2191, 2200 (2019). However, if the conviction or convictions relied upon by the government in a § 922(g)(1) prosecution are disqualified as predicates under the definitional provisions of § 921(a)(20), a defendant is not in a prohibited category at all. Section 922(g)(1) would not apply as a matter of law, regardless of what a defendant knows or thinks he knows about his status. Because whether Jackson's Minnesota felonies fell within the restoration

27

exclusion is a question of law not impacted by *Rehaif*, the district court committed no abuse of discretion in declining to instruct the jury on the statutory definition of the exclusion.[6]

Jackson's reliance on the district court's statement that "the question of whether the Defendant is a felon is a question of law, not fact" is misplaced. Jackson Br. 10, 13. In referring to whether Jackson was a felon as a question of law, the district court was characterizing its (accurate) conclusion that whether Jackson's Minnesota felonies actually qualified for the restoration exclusion under § 921(a)(20) was a legal question. The district court did not thereby remove from jury consideration any element of a § 922(g)(1) offense. Rather, the jury instructions required the jury to find all four post-*Rehaif* elements, including that the government had proven beyond a reasonable doubt that Jackson had been convicted of a crime punishable by imprisonment for more than one year (the first element) and that

---

[6] The district court correctly concluded as a matter of law that Jackson's two Minnesota drug felonies were not disqualified as § 922(g)(1) predicates under the restoration exclusion. *See* Jackson Br. 8 (conceding that Jackson's alleged belief that he was a "nonviolent felon" entitled to possess firearms under the restoration exclusion was not accurate).

Appellate Case: 22-2870   Page: 38   Date Filed: 02/27/2023 Entry ID: 5249213

Jackson knew that he had been convicted of a crime punishable by imprisonment for more than one year (the third element). R. Doc. 65, at 12 (Jury Instruction).

Moreover, the district court's email communication to the parties, upon which Jackson relies, expressly distinguishes the legal "felon" question from Jackson's claimed mens rea defense, namely his assertion that because of his "reliance on the probation officer, [Jackson] believed he was no longer a convicted felon." Jackson Add. 8. Consistent with that distinction, the district court instructed the jury that in resolving the mens rea element of the offense (the third element), it "may consider whether the defendant reasonably believed that his civil rights had been restored, including his right to possess a firearm." R. Doc. 65, at 15. The district court's § 921(a)(20) legal determination accordingly did not deprive Jackson of his claimed defense.

Finally, the district court's communication was issued in response to Jackson's initial assertion, later abandoned, that he "was not guilty as a matter of law" by virtue of the restoration exclusion and that the district court "probably doesn't have jurisdiction at this point

to – because of – as a matter of law, he doesn't fit the definition." TT, Vol. III at 417-19. The district court, in response, accurately suggested that whether Jackson's felony predicates were disqualified under the restoration exclusion was a legal question distinct from what Jackson may have believed about his status. *Id.* at 425; Jackson Add. 8. After the email communication, Jackson agreed that his convictions were not disqualified as a matter of law and abandoned that claim. TT, Vol. III at 437-38. At that point, the final form of instructions underwent further, extensive discussion about Jackson's assertion of mistaken belief, during which Jackson did not seek inclusion of the statutory definition. Jackson's challenge on appeal to the district court's formulation of the instruction on his alleged "genuine, but mistaken belief" is addressed below.[7]

---

[7] If the district court had abused its discretion in declining to include the statutory definition of the restoration exclusion in the instructions, any such error would be harmless. As is reviewed below, the district court gave an instruction on Jackson's claimed defense that, taken together with the instructions as a whole, fairly and adequately submitted Jackson's assertion of mistaken belief to the jury.

Appellate Case: 22-2870    Page: 40    Date Filed: 02/27/2023 Entry ID: 5249213

**D.    Jackson Waived His Claim That The Formulation Of The Mens Rea Instruction Was An Abuse Of Discretion.**

**1.    The District Court's Instruction**

The district instructed element 3 of the felon-in-possession charged required "the government to prove that at the time the defendant knowingly possessed the firearm, he knew he had been convicted of a crime punishable by imprisonment for more than one year." R. Doc. 65, at 12, 14. The court further instructed the jury that "[f]or you to find that element number three is proved beyond a reasonable doubt, you must unanimously agree that the defendant knew he had been convicted of a crime punishable by imprisonment of more than one year at the time he knowingly possessed the firearm described in the Indictment." R. Doc. 65, at 15. The court continued:

> In making that determination, you may consider whether the defendant reasonably believed that his civil rights had been restored, including his right to possess a firearm. If you do not all agree that the government had proved this element beyond a reasonable doubt, then you must find the defendant not guilty of the offense of being a felon in possession of a firearm.

R. Doc. 65, at 15.

## 2.    Standard of Review

When a defendant expressly agrees to the part of jury instructions he later challenges, the doctrine of invited error applies, and any objection to the instruction is waived. *United States v. Pickens*, 58 F.4th 983, 989-90 (8th Cir. 2023); *United States v. Davis*, 826 F.3d 1078, 1082 (8th Cir. 2016). Absent waiver, if a defendant did not object in district court to the part of the instruction challenged on appeal, this Court "review[s] the issue for plain error only." *United States v. Reed*, 636 F.3d 966, 970 (8th Cir. 2011).

## 3.    Jackson Waived A Challenge To The District Court's "May Consider" Formulation.

Jackson challenges on appeal the portion of the jury instructions that advised the jury it "may consider" whether the defendant reasonably believed that his civil rights had been restored, including his right to possess a firearm. Jackson Br. 12, 13. He asserts that the "may consider" formulation was deficient because, he claims, it permitted, but did not require, the jury to consider whether he had a reasonable belief his civil rights had been restored. *Id.* Jackson, however, not only agreed to the "may consider" formulation, he also

32

suggested precisely how it should be incorporated into the instructions. The claim is accordingly waived.

When formulating the jury instruction, the district court suggested that the third element provide that the government must prove that Jackson "knew he had been convicted of a crime punishable by imprisonment for more than one year or he could not reasonably believe that his civil rights had been restored, including his right to possess a firearm." *See* TT, Vol. IV at 493, 496. Jackson adopted the "may consider" formulation, but suggested it be repositioned. *See* TT, Vol. IV at 497-99. His suggestions that the "may consider" clause be moved out of the third element into the definitional provisions and be prefaced by "in making that [third element] determination" were accepted by the government and adopted by the district court in its final charge. *See* TT, Vol. IV at 497-99; R. Doc. 65, at 15 (final jury instruction). Under these circumstances, Jackson waived his instructional challenge to the "may consider" formulation, and review of the claim is accordingly foreclosed. *See*, *e.g.*, *Pickens*, 58 F. 4th at 990 (noting that "[w]hen a defendant has requested an instruction that

33

included the language he now objects to his objection is therefore waived" (internal quotation marks, ellipsis, and citation omitted)).

**4.  Even If The Claim Is Not Waived, The District Court's "May Consider" Formulation Was Not Plainly Erroneous.**

The district court did not plainly err by instructing the jury it "may consider whether the defendant reasonably believed that his civil rights had been restored, including his right to possess a firearm." Jackson Br. 12, 13. First, the "may consider" formulation was no abuse of discretion, and thus there was no error. The "may consider" formulation is identical to the language used in this Court's model instructions advising juries about what evidence they can rely upon in resolving scienter. *See* Eighth Circuit Model Criminal Jury Instruction 6.15.77q(a) at 155 (2021) (advising jury it "may consider" whether defendant profited in deciding whether defendant intended to defraud); 6.18.875B at 252 (advising jury it "may consider" surrounding circumstances in determining whether defendant's had intent to extort); 9.08A at 718, ¶ 3 (stating that "[e]vidence that the defendant acted in good faith may be considered by you together with all the other evidence, in determining whether or not the defendant

34

acted with" intent to defraud). The district court made explicit (precisely as proposed by Jackson) that consideration of the defendant's reasonable belief was for "making th[e] determination" of whether the government had proven the *Rehaif* knowledge element beyond a reasonable doubt. R. Doc. 65, at 15; *see United States v. Robinson*, 982 F.3d 1181, 1186 (8th Cir. 2020) (suggesting that a defendant who "genuinely but mistakenly believes" his rights had been restored may have a defense that "negates" the mens rea element of a § 922(g)(1) offense, quoting and citing *Rehaif*). Other instructions also emphasized that "[a]n act is done knowingly if the defendant is aware of the act and *does not act through ignorance, mistake, or accident*," further amplifying Jackson's claim of mistaken belief. R. Doc. 65, at 16 (emphasis added) (twice referring to "knowingly" meaning not acting because of "ignorance, mistake, or accident"). Taken together with the instructions as a whole, the challenged language fairly and adequately submitted Jackson's assertion of mistaken belief to the jury.

This Court's decision in *United States v. Burning Breast* is instructive as to the alleged abuse of discretion. In *Burning Breast*,

Appellate Case: 22-2870    Page: 45    Date Filed: 02/27/2023 Entry ID: 5249213

this Court reviewed whether the district court's jury charge on the restoration exclusion was an abuse of discretion. 8 F.4th 808 (8th Cir. 2021). The defendant, charged with possessing a rifle as a felon, claimed he (1) mistakenly, but genuinely, believed his right to possess a firearm had been restored under tribal law, and (2) mistakenly, but genuinely, believed his predicate federal conviction had been expunged or he had received a presidential pardon. *Id.* at 814-15. Before trial, the district court granted the government's motion to exclude evidence regarding the defendant's claimed "mistake of law" as to his status as a prohibited person as well as his "possible belief that the prior conviction had been expunged." *Id*. at 811. At trial, there was evidence that the defendant told police upon his arrest that he must have received a presidential pardon because, he claimed, the Navy had no record of his federal felony conviction when he applied to serve after convicted. *Id.*

The defendant asked the district court to give an instruction stating that he "had to know his prior conviction was not expunged." *Id.* at 812. The district court declined that instruction, and this Court held that the district court did not abuse its discretion because the

36

instruction "would have added a fifth element to the crime, unsupported by the law." *Id.* at 815. Rather, the district court's provision to the jury of § 921(20)(a)'s expungement and pardon language "maintained Burning Breast's ability to argue he lacked the requisite knowledge of a prohibited person." *Id.* The district court's instructions here went further than *Burning Breast* in adequately maintaining the defendant's ability to argue his asserted mens rea defense.

Jackson, in fact, may have received a more favorable instruction than he was entitled to. As is noted below, this Court has not squarely decided whether "mistaken belief" is a valid defense to a § 922(g)(1) charge. *Robinson*, 982 F.3d at 1186 (assuming, without deciding, that it is). To the extent it is a valid defense, its contours have not been developed in this or other jurisdictions. If a defendant meets his or her burden of production as to a claim of genuine, but mistaken belief, locating the claim within the government's burden of proof on § 922(g)(1)'s mens rea element is consistent with how a defense like good faith is treated. *See* Eighth Circuit Model Criminal Jury Instructions 9.08A at 718, ¶ 3 (2021). However, here Jackson's mens

37

rea claim is that he relied on erroneous advice from a government official that certain conduct was legal. That claim would typically be treated as an entrapment by estoppel defense, for which the defendant, not the government, assumes the ultimate burden of persuasion. *See id.*, 9.01A at 704.

Particularly given this unsettled state of the law, even if the district court erred, the error was not plain. *See United States v. Pazour*, 609 F.3d 950, 953-54 (8th Cir. 2010) (noting that where no precedent from Supreme Court or this Court directly resolving an issue, there can be no plain error). Before *Rehaif*, this Court held that whether a defendant believed his civil rights had been restored and that his conduct was, therefore, lawful was "irrelevant to the mens rea" of a § 922(g)(1) offense. *United States v. Lomax*, 87 F.3d 959, 962 (8th Cir. 1996). After *Rehaif*, however, this Court observed that "it may be that a defendant who genuinely but mistakenly believes that he has had his individual rights restored has a valid defense to a felon-in-possession charge." *United States v. Robinson*, 982 F.3d 1181, 1186 (8th Cir. 2020). The Court in *Robinson* assumed without deciding that the defense was available. *Id.* at 1187. In *Burning Breast*, this Court's

38

only opinion after *Robinson* involving a claimed § 921(a)(20) defense, the question left open in *Robinson* was similarly unnecessary to address given the district court made a pretrial ruling excluding evidence regarding the defendant's subjective state of mind then delivered an instruction that did not address subjective intent, but instead focused on whether the defendant had actually had his civil rights substantially restored. At the very least and as discussed above, to the extent the defense is valid, its contours are uncertain at best.

Finally, even if there was error that was plain, Jackson has not demonstrated the error affected his substantial rights. To prevail on the substantial rights prong of plain error review, Jackson must show a reasonable probability that, but for the error, the outcome of the proceeding would have been different. *See, e.g.*, *United States v. Mink*, 9 F.4th 590, 611-12 (8th Cir. 2021). Here, as is summarized in the factual background section above, the evidence was strong that Jackson did not have a reasonable belief that his civil rights had been restored such that he could legally possess a gun. His flight from police, his shedding of his jacket with the gun in it, his post-arrest statements to A.W., the written advisories on his discharge papers,

39

and his trial testimony, which lacked in critical respects, demonstrate no reasonable probability that he would have been acquitted with an instruction the jury be "required" to consider his reasonable belief claim.

Jackson suggests that the district court's responses to two jury questions were inaccurate. Jackson Br. 14-16. As is noted above, assuming the instructional claim was not waived, the district court's "may consider" formulation was not plainly erroneous, and the district court appropriately directed the jury back to that formulation in determining whether the government had proven the mens rea element beyond a reasonable doubt. R. Doc. 70 (first response, to which Jackson did not object); R. Doc. 71 (second response). As the district court noted in discussing the questions with the parties, the jury was clearly considering Jackson's claimed reasonable belief defense in the context of the instructions as a whole, with the jury citing the portions of the instructions covering the mens rea element, Jackson's reasonable belief, and that "[a]n act is done knowingly if the defendant is aware of the act and does not act through ignorance, mistake, or accident." TT, Vol. IV at 579 (noting that jury was focused on the

Appellate Case: 22-2870    Page: 50    Date Filed: 02/27/2023 Entry ID: 5249213

proper parts of the instructions); R. Doc. 69 (second jury question, citing portions of the instructions). Jackson's suggestion that the district court answer "no" to the second question was not accurate and neutral; as the district court observed, the jury's second question asked about the defendant "believing his civil rights had been restored," a belief that would not suffice unless, as the jury was instructed, that belief extended to the right to possess firearms. *See* TT, Vol. V at 582-83. In sum, the jury instructions, taken as a whole, adequately submitted Jackson's assertion of reasonable belief to the jury, and the district court's accurate, neutral responses to the jury's questions do not demonstrate error.

## II. The District Court Correctly Rejected Jackson's Second Amendment Challenge To Section 922(g)(1).

### A. Standard Of Review

This Court reviews the constitutionality of a statute de novo. *United States v. Seay*, 620 F.3d 919, 923 (8th Cir. 2010).

### B. The *Bruen* Decision

#### 1. *Bruen* and the Second Amendment Standard

In *Bruen*, the Court held that the Second Amendment protects the right of "law-abiding, responsible citizens" to "carry a handgun for

41

self-defense outside the home." 142 S. Ct. at 2156. The Court struck down a New York law that required residents to demonstrate a "proper[ ]cause" to obtain a license to carry a handgun outside the home because that law "prevent[ed] law-abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms." *Id.* In reaching this conclusion, *Bruen* rejected the "'two-step'" Second Amendment framework adopted by most courts of appeals after *Heller* that "combine[d] history with means-end scrutiny." *Id.* at 2125; *see* p. 4, *supra* (summarizing the two-step framework). *Bruen* observed that "[s]tep one of the predominant framework is broadly consistent with *Heller*, which demands a test rooted in the Second Amendment's text, as informed by history." *Bruen*, 142 S. Ct. at 2127. But the Court "decline[d] to adopt" the second step of that framework, holding that "*Heller* and *McDonald* do not support applying means-end scrutiny in the Second Amendment context." *Id.* at 2126-27.[8]

---

[8] This Court had not adopted the two-step framework discussed in *Bruen. See United States v. Hughley*, 691 F. App'x 278, 279 n.3 (8th Cir. 2017) (noting this Court has "not adopted [the two-step] approach and decline to do so here").

Appellate Case: 22-2870    Page: 52    Date Filed: 02/27/2023 Entry ID: 5249213

*Bruen* thus clarified the "standard for applying the Second Amendment." 142 S. Ct. at 2129. First, "[w]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Id.* at 2129-30. Second, when a regulation infringes such presumptively protected conduct, "[t]he government must . . . justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2130. The Court explained that the relevant "metrics" for assessing a regulation's constitutionality are "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2133 (emphasis added).

## 2. The Supreme Court Has Not Cast Doubt On Felon-Dispossession Statutes.

The Supreme Court has emphasized that its decisions should not "be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons." *D.C. v. Heller*, 554 U.S. 570, 626 (2008); *see also McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010) (plurality opinion) ("repeat[ing]" *Heller*'s "assurances" regarding such prohibitions). And in *Bruen*, six Justices took pains to reiterate that certain firearms regulations, including prohibitions on the possession

43

of firearms by felons, are constitutional. *See Bruen*, 142 S. Ct. at 2157 (Alito, J., concurring) (explaining that *Bruen* did not "disturb[] anything that [the Court] said in *Heller* or *McDonald* about restrictions that may be imposed on the possession or carrying of guns" (citation omitted)); *id.* at 2162 (Kavanaugh, J., joined by Roberts, C.J., concurring) (reiterating that "longstanding prohibitions on the possession of firearms by felons" are constitutional under *Heller* and *McDonald* (quotation marks omitted)); *id.* at 2189 (Breyer, J., joined by Sotomayor and Kagan, JJ., dissenting) (same).

Consistent with the Supreme Court's admonitions about prohibitions on firearm possession by felons, this Court has repeatedly rejected facial challenges to the constitutionality of § 922(g)(1). *See, e.g., United States v. Woolsey*, 759 F.3d 905, 909 (8th Cir. 2014); *United States v. Joos*, 638 F.3d 581, 586 (8th Cir. 2011); *Seay*, 620 F.3d at 924; *United States v. Irish*, 285 F. App'x. 326, 327 (8th Cir. 2008). This Court has also rejected every as-applied challenge to § 922(g)(1) that it has reviewed, while not resolving whether any such challenge might ever be successful. *See United States v. Williams*, 24 F.4th 1209, 1211 (8th Cir. 2022); *see also, e.g., United States v.*

44

*Hughley*, 691 F. App'x 278, 279-80 (8th Cir. 2017); *United States v. Siegrist*, 595 F. App'x 666, 667-68 (8th Cir. 2015); *Woosley*, 759 F.3d at 909; *United States v. Brown*, 436 F. App'x 725, 726 (8th Cir. 2011). Indeed, "no circuit" has ever "held [18 U.S.C. § 922(g)(1)] unconstitutional as applied" to an individual convicted of an offense classified as a felony. *Medina v. Whitaker*, 913 F.3d 152, 155 (D.C. Cir. 2019) (collecting cases). And in at least 95 cases since *Bruen*, district courts have unanimously rejected Second Amendment challenges to § 922(g)(1) based on text, history, precedent, or a combination of the three. *See generally United States v. Greaves*, __ F. Supp.3d __, 2023 WL 1791866 at *2 (M.D. Tenn. Feb. 6, 2020) (noting that at least 95 district court decisions have "unanimously reach[ed] the conclusion that Section 922(g)(1) is constitutional, notwithstanding *Bruen*").

## C. This Court Should Reject Jackson's As-Applied Challenge.

Jackson asserts only an as-applied challenge here. Jackson Br. 19. This Court has "not resolved whether the felon-in-possession statute is susceptible to as-applied challenges." *United States v, Williams*, 24 F.4th 1209, 1211 (8th Cir. 2022). If the Court resolves that question here, it should hold that the felon-in-possession statute

45

is constitutional in all its applications because the Second Amendment does not prevent Congress from generally prohibiting firearm possession by individuals convicted of crimes punishable by more than one year of imprisonment. In any event, Jackson's as-applied challenge fails even under a "dangerousness" limitation because he is "'more dangerous than a typical law-abiding citizen.'" *Woolsey*, 759 F.3d at 909 (quoting *Brown*, 436 F. App'x at 726).

> **1. The Text Of The Second Amendment And Its Historical Context Make Plain That Convicted Felons Cannot Mount Successful Attacks on 18 U.S.C. § 922(g)(1).**

To determine whether a statute comports with the Second Amendment, courts look to "the Second Amendment's plain text," as informed by "this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126. As a matter of both text and history, the Second Amendment does not prevent legislatures from prohibiting firearm possession by those who have demonstrated disregard for the rule of law through the commission of felony offense.

The Second Amendment states: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. As the

46

Supreme Court has repeatedly recognized, the protections embodied in the Second Amendment's text belong to "law-abiding, responsible citizens." *Heller*, 554 U.S. at 635. Since *Heller*, the Supreme Court has twice reaffirmed—first in *McDonald*, then in *Bruen*—that the right to bear arms is limited to law-abiding citizens. Indeed, *Bruen* defines the Second Amendment as belonging to "law-abiding" citizens 14 times. *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2122, 2125, 2131, 2133-34, 2135 n.8, 2138 & n.9, 2150, 2156 (2022). Consistent with that principle, while *Bruen* invalidated New York's "may-issue" licensing regime, it approved "shall-issue" regimes that "require applicants to undergo a background check or pass a firearms safety course." *Id.* at 2138 n.9; *see id.* at 2162 (Kavanaugh, J., joined by Roberts, C.J., concurring) ("[S]hall-issue licensing regimes are constitutionally permissible[] . . . ."). The Court explained that such regimes—many of which prohibit the issuance of licenses to felons—generally pass constitutional muster because they "are designed to ensure only that those bearing arms . . . are, in fact 'law-abiding, responsible citizens.'" *Id.* at 2138 n.9 (majority op.) (quoting *Heller*, 554 U.S. at 635).

47

Although this Court has not resolved whether § 922(g)(1) is constitutional in all its applications, the Court has affirmed § 922(g) convictions "on a rationale consistent with the conclusion that those convicted of felony offenses do not possess Second Amendment rights—albeit at times in unpublished opinions." *United States v. Adams*, 914 F.3d 602, 611 (8th Cir. 2019) (Kelly, J., concurring). In *United States v. Bena*, a published opinion, the Court concluded that "[i]t seems most likely that the Supreme Court viewed the regulatory measures listed in *Heller*," which included prohibitions on firearms possession by felons, "as presumptively lawful because they do not infringe on the Second Amendment right." 664 F.3d 1180, 1183 (8th Cir. 2011). To that end, the Court explored at length *Heller*'s characterization of the Second Amendment as guaranteeing "'the right of *law-abiding, responsible* citizens to use arms in defense of hearth and home.'" 664 F.3d 1180, 1183 (quoting *Heller*, with italicized emphasis added by this Court). The Court reviewed scholarship that suggested "historical support for a common-law tradition that permits restrictions directed at citizens who are not law-abiding and responsible." *Id.* Reviewing Blackstone's *Commentaries*, proposals

Appellate Case: 22-2870    Page: 58    Date Filed: 02/27/2023 Entry ID: 5249213

from the Founding period, and Second Amendment scholarship, the Court concluded that § 922(g)(8)'s prohibition of firearm possession by those posing a threat to the physical safety of an intimate partner or child is "consistent with a common-law tradition that the right to bear arms is limited to peaceable or virtuous citizens." *Id.* at 1183-84. The district court therefore correctly recognized that this Court's existing review of "historical scholarship from the Founding Era reveals that gun restrictions were not limited to those deemed to be dangerous." R. Doc. 114, at 5 (discussing *Bena*).

Indeed, consistent with this Court's review in *Bena* of restrictions directed at citizens who are not law-abiding and responsible, legislatures have historically had wide latitude to exclude felons from the political community. As Thomas Cooley explained in his "massively popular 1868 Treatise on Constitutional Limitations," *Heller*, 554 U.S. at 616, "the *people* in whom is vested the sovereignty of the State . . . cannot include the whole population," and "[c]ertain classes have been almost universally excluded"—including "the idiot, the lunatic, and the felon, on obvious grounds," Thomas M. Cooley, *A Treatise on the Constitutional Limitations Which Rest Upon the*

49

*Legislative Power of the States of the American Union* 28-29 (1st ed. 1868). Felons could therefore historically be excluded from "exercis[ing] the elective franchise," *id.* at 29, as well as from other, closely related "political rights"—including the rights to "hold public office," to "serve on juries," and, most relevant here, "the right to bear arms," Akhil Reed Amar, *The Bill of Rights* 48 (1998). Today it remains the case that "[t]he commission of a felony often results in the lifelong forfeiture of a number of rights" tied to membership in the political community, including "the right to serve on a jury and the fundamental right to vote." *Medina*, 913 F.3d at 160; *see also Spencer v. Kemna*, 523 U.S. 1, 8-9 (1998) (noting that consequences of a felony conviction can include deprivation of the right to hold office).

In addition to felons falling outside the scope of the Second Amendment's protection of the right of law-abiding, responsible citizens to possess firearms, a comprehensive review of historical tradition confirms legislatures' authority to prohibit felons from possessing firearms. Beginning in England and lasting at least through the founding era, history is replete with "representative historical analogue[s]" for Section 922(g)(1) that shed light on the

50

scope of the Second Amendment and the power of legislatures. *Bruen*, 142 S. Ct. at 2133-34 (emphasis omitted). Two types of historical laws are particularly pertinent: (a) laws categorically disqualifying groups from possessing firearms based on a judgment that the group could not be trusted to adhere to the rule of law; and (b) laws authorizing capital punishment and estate forfeiture for felonies.

By the time of the Second Amendment's ratification in 1791, there was an established tradition of legislatures exercising broad authority to categorically disqualify people from possessing firearms based on a judgment that certain individuals could not be trusted to adhere to the rule of law. First, because the Second Amendment "'codified a right inherited from our English ancestors,'" English legal tradition sheds light on the scope of the "'right secured by the Second Amendment'"—which, as with the English right, "'is not unlimited.'" *Bruen*, 142 S. Ct. at 2127-28 (quoting *Heller*, 554 U.S. at 599, 626). Among the limits well-established in England was the authority to disarm classes of people who, in the legislature's view, could not be depended upon to obey the rule of law. *See, e.g.*, 1 W. & M., Sess. 1, c. 15, in 6 *The Statutes of the Realm* 71-73 (1688) (codifying an "Act for

the better secureing the Government by disarming Papists and reputed Papists," which provided that any Catholic who refused to make a declaration renouncing his or her faith could not "have or keepe in his House or elsewhere" any "Arms[,] Weapons[,] Gunpowder[,] or Ammunition (other than such necessary Weapons as shall be allowed to him by Order of the Justices of the Peace . . . for the defence of his House or person"). This example is particularly relevant because the same Parliament "wr[ote] the 'predecessor to our Second Amendment' into the 1689 English Bill of Rights," which similarly drew a religion-based distinction, among other limitations. *Bruen*, 142 S. Ct. at 2141 (quoting *Heller*, 554 U.S. at 593); *see* 1 W. & M., Sess. 2, c. 2, in 6 *The Statutes of the Realm* 143 (1688) (specifying that that "Protestants may have Arms for their Defence suitable to their Conditions and as allowed by Law").

The American colonies inherited the English tradition of broad legislative authority to disarm classes of people who were viewed as not dependable adherents to the rule of law. Massachusetts, for example, disarmed the supporters of preacher Anne Hutchinson in the 1630s not because of a demonstrated propensity for violence, but

52

because of their lack of fealty to the rule of law. *See Range v. Attorney General*, 53 F.4th 262, 266 (3d Cir. 2022) (per curiam) (collecting historical scholarship), *vacated upon granting of rehearing en banc*, 56 F.4th 992 (3d Cir. 2023).[9] To take another example, during the French and Indian War, Virginia imported the English tradition of disarming Catholics who refused to take a loyalty oath. *See 7 The Statutes at Large; Being A Collection of All the Laws of Virginia* 35-39 (1820) (1756 Va. law).

Over the course of the Revolutionary War, American legislatures passed numerous laws "disarming non-violent individuals because their actions evinced an unwillingness to comply with the legal norms of the nascent social compact"—often specifically targeting those who failed to demonstrate loyalty to the emergent American government. *Range*, 53 F.4th at 277. An early example is a 1775 Connecticut law providing that any person convicted of "libel[ing] or defam[ing]" any acts or resolves of the Continental Congress or the Connecticut General Assembly "made for the defence or security of the rights and

---

[9] Though the panel opinion in *Range* has been vacated pending rehearing en banc, the opinion retains its persuasive value.

Appellate Case: 22-2870     Page: 63     Date Filed: 02/27/2023 Entry ID: 5249213

privileges" of the colonies "shall be disarmed and not allowed to have or keep any arms." *The Public Records of the Colony of Connecticut From May, 1775 to June, 1776*, at 1993 (1890) (1775 Conn. law). In 1776, the Continental Congress recommended that the colonial governments disarm those who were "notoriously disaffected to the cause of America" or who simply "have not associated" with the colonial governments in the war effort. 4 *Journals of the Continental Congress 1774-1789*, at 205 (1906) (resolution of March 14, 1776). At least six of the governments enacted legislation in this vein, requiring oaths of loyalty to the government and to strip anyone who failed or refused to take the oath of the right to bear arms. *See* 5 *The Acts and Resolves, Public and Private, of the Province of the Massachusetts Bay* 479-84 (1886) (1776 Mass. law); 7 *Records of the Colony of Rhode Island and Providence Plantations in New England* 567 (1862) (1776 R.I. law); 1 *The Public Acts of the General Assembly of North Carolina* 231 (1804) (1777 N.C. law); *Acts of the General Assembly of the State of New-Jersey at a Session Begun on the 27th Day of August, 1776*, at 90 (1777) (1777 N.J. law); 9 *The Statutes at Large of Pennsylvania from 1682 to 1801*, at 112-13 (1903) (1777 Pa. law); 9 *The Statutes at*

54

*Large; Being A Collection of All the Laws of Virginia* 282 (1821) (1777
Va. law). Many of these laws provided that failing or refusing to take
the oath resulted in forfeiture of a bundle of additional political rights,
including the rights to vote, to serve on juries, and to hold public
office—further reinforcing the longstanding connection between arms-
bearing and these related rights. *See, e.g.*, 1776 Mass. law at 481; 1777
N.C. law at 231; 1777 Pa. law at 112-13; 1777 Va. law at 282.[10]

The Constitution's ratification debates support this
understanding of the Amendment's text. Indeed, the historical
background of the Second Amendment's adoption provides
particularly persuasive evidence that the founders understood that

---

[10] The Pennsylvania law is particularly informative because the
year before enacting it, Pennsylvania became one of the first states to
adopt a state constitutional provision protecting an individual right to
bear arms. *Heller*, 554 U.S. at 601; see Pa. Declaration of Rights of
1776 § XIII, in The Complete Bill of Rights: The Drafts, Debates,
Sources, And Origins 278 (Neil Cogan ed., Oxford University Press 2d
ed., 2014); see also N.C. Declaration of Rights of 1776 § XVII, in The
Complete Bill of Rights, supra, at 277-78 (individual rights-based
constitutional provision adopted the year before the North Carolina
disarmament law cited above); Mass. Const. of 1780, pt. I, art. XVII,
in The Complete Bill of Rights, supra, at 277 (individual rights-based
constitutional provision adopted four years after the Massachusetts
disarmament law cited above).

Appellate Case: 22-2870     Page: 65     Date Filed: 02/27/2023 Entry ID: 5249213

the constitutional right to bear arms is compatible with broad legislative authority to disarm groups legislatures did not trust to follow the law. In *Bena*, this Court reviewed ratification-era proposals in Massachusetts and Pennsylvania. *See Bena*, 664 F.3d at 1183-84. The Pennsylvania proposal, which *Heller* called "highly influential" and referred to as a "Second Amendment precursor[]," 554 U.S. at 604, provided for an amendment guaranteeing the right to bear arms "*unless for crimes committed, or real danger of public injury*." *Bena*, 664 F.3d at 1184 (quoting 2 Bernard Schwartz, *The Bill of Rights: A Documentary History* 662, 665 (1971)) (emphasis added by this Court in *Bena*). And in New Hampshire, the convention recommended an amendment providing that "Congress shall never disarm any Citizen unless such as are or have been in *Actual Rebellion*." *Id.* at 758, 761 (emphasis added). These proposals recognize the prevailing historical tradition of broad legislative power to disarm people who fell outside the trustworthy, law-abiding citizenry—so the proposals cannot be

"shoehorn[ed] . . . into the silo of dangerousness." *Folajtar v. Attorney*

*Gen.*, 980 F.3d 897, 908-09 (3d Cir. 2020).[11]

In addition, with respect to punishment for felony offenses, for

centuries, felonies have been "the most serious category of crime."

*Medina*, 913 F.3d at 158. In 1769, Blackstone defined a felony as "an

offence which occasions a total forfeiture of either lands, or goods, or

both, at the common law; and to which capital or other punishment

may be superadded, according to the degree of guilt." 4 William

Blackstone, *Commentaries on the Laws of England* 95 (1769).

Blackstone observed that "[t]he idea of felony is indeed so generally

---

[11] The Second Amendment as adopted does not include the same language as these proposals. But it would have been "obvious" to the founders that certain groups, including (but not necessarily limited to) "the felon," Cooley, *supra*, at 29, could properly be subject to disarmament laws consistent with the "pre-existing right" that was "codified" in the Second Amendment, *Bruen*, 142 S. Ct. at 2127 (quoting *Heller*, 554 U.S. at 592). *See also* Amar, *supra*, at 48; Stephen P. Halbrook, The Founders' Second Amendment: Origins of the Right to Bear Arms 273 (2008) (explaining that founding-era proponents of a constitutional right to bear arms "did not object to the lack of an explicit exclusion of criminals from the individual right to keep and bear arms" during the debates over "what became the Second Amendment," because this limitation "was understood").

connected with that of capital punishment, that we find it hard to separate them." *Id.* at 98.

Capital punishment and forfeiture of estate were also commonly authorized punishments in the American colonies (and then the states) up to the time of the founding. *Folajtar*, 980 F.3d at 904-05. Capital punishment for felonies was "ubiquit[ous]" in the late eighteenth century and was "'the standard penalty for all serious crimes.'" *See Baze v. Rees*, 553 U.S. 35, 94 (2008) (Thomas, J., joined by Scalia, J., concurring in the judgment) (quoting Stuart Banner, *The Death Penalty: An American History* 23 (2002)). Indeed, the First Congress (which drafted and proposed the Second Amendment) made a variety of felonies punishable by death, including not only offenses like treason, murder on federal land, and piracy on the high seas, but also non-violent conduct relating to forging or counterfeiting a public security. *See* An Act for the Punishment of Certain Crimes Against the United States, 1 Stat. 112-15 (1790). States in the early Republic likewise treated "nonviolent crimes such as forgery and horse theft" as "capital offenses." *Medina*, 913 F.3d at 159; *see* Banner, *supra*, at 18 (referring to specific examples of individuals in Georgia who "escaped

58

from jail after being condemned to death" for "forgery" or "horse-stealing"). And many American jurisdictions up through the end of the 1700s authorized complete forfeiture of a felon's estate. *See* Beth A. Colgan, *Reviving the Excessive Fines Clause*, 102 Cal. L. Rev. 277, 332 & nn.275-276 (2014) (citing statutes); *see also, e.g.*, 2 *Laws of the State of New York Passed at the Sessions of the Legislature (1785-1788)*, at 664-65 (1886) (1788 N.Y. law) (providing for the death penalty for crimes including counterfeiting among other crimes); 9 *The Statutes at Large; Being a Collection of All the Laws of Virginia, from the First Session of the Legislature* 302-03 (1821) (1777 Va. forgery law) (providing that forgers and counterfeiters "shall be deemed and holden guilty of felony, shall forfeit his whole estate, real and personal, shall receive on his bare back, at the publick whipping post, thirty nine lashes, and shall serve on board some armed vessel in the service of this commonwealth, without wages, for a term not exceeding seven years"); *A Digest of the Laws of Maryland* 255-56 (1799) (collecting Maryland forgery laws enacted between 1776 and 1778, each of which provided that those convicted "shall suffer death as a felon, without benefit of clergy"); *see generally Medina*, 913 F.3d at 158 ("[I]t is

Appellate Case: 22-2870     Page: 69     Date Filed: 02/27/2023 Entry ID: 5249213

difficult to conclude that the public, in 1791, would have understood someone facing death and estate forfeiture to be within the scope of those entitled to possess arms.").

Both sets of historical traditions surveyed above demonstrate Section 922(g)(1)'s constitutionality. The historical record shows that legislatures historically disqualified categories of persons from possessing firearms, just as felon-dispossession statutes do today. History shows that legislatures' reasons for doing so could include a legislative judgment that the disarmed persons could not be counted upon to be responsible, law-abiding members of the polity, just as felon-dispossession statutes do today. And history demonstrates that people who committed felonies at the time of the founding would have been exposed to far more severe consequences than disarmament including capital punishment and estate forfeiture.

In keeping with Supreme Court precedent, this Court's reasoning in *Bena*, and the textual and historical discussion above, several courts of appeals have categorically upheld felon-possession prohibitions without relying on means-end scrutiny. *See, e.g.*, *United States v. Scroggins*, 599 F.3d 433, 451 (5th Cir. 2010) (recognizing that

Appellate Case: 22-2870     Page: 70     Date Filed: 02/27/2023 Entry ID: 5249213

"criminal prohibitions on felons (violent or nonviolent) possessing firearms [do] not violate" the Second Amendment); *In re United States*, 578 F.3d 1195, 1200 (10th Cir. 2009) (unpublished) ("We have already rejected the notion that *Heller* mandates an individualized inquiry concerning felons pursuant to § 922(g)(1)." (citing *United States v. McCane*, 573 F.3d 1037, 1047 (10th Cir. 2009)); *United States v. Rozier*, 598 F.3d 768, 771 (11th Cir. 2010) ("[S]tatutes disqualifying felons from possessing a firearm under any and all circumstances do not offend the Second Amendment."); *accord Medina v. Whitaker*, 913 F.3d 152, 157-61 (D.C. Cir. 2019) ("look[ing] to tradition and history" to "hold that those convicted of felonies are not among those entitled to possess arms"); *Hamilton v. Pallozzi*, 848 F.3d 614, 626 (4th Cir. 2017) ("[W]e simply hold that conviction of a felony necessarily removes one from the class of 'law-abiding, responsible citizens' for the purposes of the Second Amendment[.]"); *United States v. Vongxay*, 594 F.3d 1111, 1115 (9th Cir. 2010) ("[F]elons are categorically different from the individuals who have a fundamental right to bear arms[.]").[12]

---

[12] A panel of the Fifth Circuit recently invalidated Section 922(g)(8), a separate provision restricting firearm possession by persons subject to qualifying protective orders. *See United States* v.

If the Court resolves in this case whether § 922(g)(1) is constitutional in all its applications, it should reach the same conclusion.

### 2. At The Very Least, § 922(g)(1) Is Constitutional As Applied to Jackson Based on His Eleven Prior Felony Convictions, Several Of Which Are For Drug Trafficking.

In any event, § 922(g)(1) is constitutional as applied to those like Jackson who are dangerous felons.[13] Jackson states, in conclusory fashion, that § 922(g)(1) is unconstitutional as applied to him because his "non-violent criminal history for possession and attempted sales of cocaine were all non-violent offenses that certainly do not render him

---

*Rahimi*, 2023 WL 1459240 (5th Cir. Feb. 2, 2023). The government believes that decision was mistaken, and it will seek further review. *See* Statement from Attorney General Merrick B. Garland Regarding United States v. Rahimi (Feb. 2, 2023), https://www.justice.gov/opa/pr/statement-attorney-general-merrick-b-garland-regarding-united-states-v-rahimi. In any event, even *Rahimi* recognized that the Nation's historical tradition of firearm regulation includes numerous laws that "disarmed people by class or group" for the purpose of "preservation of political and social order." 2023 WL 1459240, at *8. That tradition supports § 922(g)(1).

[13] The fact that Jackson is plainly dangerous is *sufficient* to demonstrate that § 922(g)(1) is constitutional as applied to him, but it is not a *necessary* condition for application of § 922(g)(1) to comport with the Second Amendment. Courts have correctly "reject[ed] the argument that non-dangerous felons have a right to bear arms." *Medina*, 913 F.3d at 159; *see also, e.g.*, *Range*, 53 F.4th at 283; *Folajtar*, 980 F.3d at 907.

any more dangerous than the typical law-abiding citizen." Jackson Br. 20. The district court was right to conclude otherwise. R. Doc. 114, at 6.

This Court has rejected as-applied challenges to § 922(g)(1) when the defendant is "'more dangerous than a typical law-abiding citizen,'" *Woolsey*, 759 F.3d at 909 (quoting *Brown*, 436 F. App'x at 726).[14] With respect to dangerousness, Jackson's eleven total felony convictions include four drug-trafficking offenses (PSR ¶¶ 38-39, 44-45), an unlawful possession of a gun offense (PSR ¶ 40), and six additional

---

[14] This Court has also rejected as-applied challenges when the Second Amendment does not "protect[] [the challenger's] particular conduct." *Adams*, 914 F.3d at 605. Jackson suggests that *Bruen* resolves whether carrying a concealed firearm in a vehicle, as Jackson did here, is categorically protected conduct under the Second Amendment. Jackson Br. 19-20; *cf. Adams*, 914 F.3d at 605-07. *Bruen* did not address that issue—particularly in a State, like Minnesota, that "has no general ban on open carrying of firearms." *Adams*, 914 F.3d at 607; *see* Minnesota Bureau of Criminal Apprehension, Permit to Carry FAQ, accessed February 22, 2023, at https://dps.mn.gov/divisions/bca/bca-divisions/administrative/Pages/Permit-to-Carry-FAQ.aspx ("Minnesota's Personal Protection Act is a permit to carry law, not a conceal and carry law. The pistol does not need to be concealed, but can be concealed."); *see generally* Minn. Stat. § 624.714 (permit to carry provisions). The Court need not reach that question here, however, given Jackson's challenge fails in any event under the "dangerousness" prong of this Court's as-applied test.

Appellate Case: 22-2870     Page: 73     Date Filed: 02/27/2023 Entry ID: 5249213

drug crimes (PSR ¶¶ 33, 40-43,46). *See Siegrist*, 595 F. App'x at 668 (citing defendant's "extensive criminal history, with twenty-two felony convictions including a commercial burglary" in denying as-applied challenge on the ground that "[p]ersons with criminal histories this extensive historically have been barred from Second Amendment protections" (internal quotation marks and citation omitted)). Particularly given the long-recognized nexus between drug trafficking, guns, and violence, the nature and extent of Jackson's felony convictions are not of the sort that could establish any as-applied relief from § 922(g)(1). *See generally* U.S.S.G. § 2D1.1(b)(1) & cmt. n.11(A) (enhancement for possession of a firearm during a drug-trafficking crime that "reflects the increased danger of violence when drug traffickers possess weapons"); *United States v. Burris*, 22 F.4th 781, 788 (8th Cir. 2022) (noting enhancement and reason for it); *United States v. Navarrete-Barron*, 192 F.3d 786, 791 (8th Cir. 1999) (noting in *Terry* stop context that drug-trafficking is "very often . . . accompanied by dangerous weapons").

   Although the Court need not consider facts beyond the nature and volume of Jackson's felony offenses to reject his as-applied

challenge, additional evidence confirms the constitutionality of applying the statute to him. Jackson has fled police on numerous occasions, both by car and on foot, and made an indirect threat of violence toward a responding officer. PSR ¶¶ 38, 44, 45. He unlawfully possessed a gun at the same time he was in possession of "several bags of crack cocaine and heroin." PSR ¶ 40. While in custody, Jackson compiled dozens of disciplinary and behavioral citations, including contraband, fighting, providing false information, and tampering with security devices. PSR ¶¶ 39-40, 46. Jackson has also repeatedly violated probationary terms, with nine revocations for failing to remain law-abiding and other infractions. PSR. ¶¶ 39-41, 44, 46. Jackson has serially reoffended despite substantial terms of incarceration and repeated court supervision, and he was discharged from his last probationary period only four months before the instant offense (part of a course of conduct that included assault and fleeing). On this record, Jackson's as-applied challenge plainly fails. *See Hughley*, 691 F. App'x at 279 (concluding that although the defendant's prior convictions for multiple drug-related felonies, his possession of a firearm along with illegal drugs, and his repeated

violations of his probation terms rendered him more dangerous than the typical law-abiding citizen).

## <u>CONCLUSION</u>

For the foregoing reasons, the district court's judgment should be affirmed.

Dated: February 24, 2023

ANDREW M. LUGER
United States Attorney

*/s/ David M. Genrich*

By:  DAVID M. GENRICH
Assistant U.S. Attorney
Attorney ID No. 0281311
600 U.S. Courthouse
300 South Fourth Street
Minneapolis, MN 55415
(612) 664-5600
Attorneys for Appellee

Appellate Case: 22-2870    Page: 76    Date Filed: 02/27/2023 Entry ID: 5249213

# CERTIFICATE OF COMPLIANCE

The undersigned attorney for the United States certifies this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32. The brief has 12,999 words, proportionally spaced using Century Schoolbook, 14-point font. The brief was prepared using Microsoft Word 365.

Dated: February 24, 2023

ANDREW M. LUGER
United States Attorney

*/s/ David M. Genrich*

By: DAVID M. GENRICH
Assistant U.S. Attorney
Attorney ID No. 0281311
600 U.S. Courthouse
300 South Fourth Street
Minneapolis, MN 55415
(612) 664-5600
Attorneys for Appellee

Appellate Case: 22-2870    Page: 77    Date Filed: 02/27/2023 Entry ID: 5249213