No: 22-2870

United States of America

Appellee

v.

Edell Jackson

Appellant

Appeal from U.S. District Court for the District of Minnesota
(0:21-cr-00051-DWF-1)

**ORDER**

The petition for en banc rehearing is denied. The petition for panel rehearing is also denied. Judges Erickson, Grasz, Stras, and Kobes would grant the petition for rehearing en banc.

COLLOTON, Circuit Judge, concurring in the denial of rehearing.

The dissent from denial of rehearing en banc asserts as its central premise that the panel opinion supposedly failed to grasp a basic point of *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), that the government bears the burden to show that the felon-in-possession statute is constitutional. (The petition for rehearing properly does not make this argument.) To the contrary, the panel was well aware of *Bruen*, and concluded that the historical evidence shows that the statute "is consistent with the Nation's historical tradition of firearm regulation." 69 F.4th at 502 (quoting *Bruen*, 142 S. Ct. at 2130). The dissent misconstrues a trailing

footnote whose only purpose was to note that it was unnecessary to address the defendant's particular conduct at the time he possessed a firearm. There will be debates about the historical evidence, but the panel opinion faithfully applied the *Bruen* framework and the Supreme Court's assurance that nothing in its originalist opinion recognizing an individual right under the Second Amendment "should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons." *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008); *accord McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010) (plurality opinion) ("We repeat those assurances here.").

STRAS, Circuit Judge, with whom ERICKSON, GRASZ, and KOBES, Circuit Judges, join, dissenting from the denial of rehearing en banc.

By cutting off as-applied challenges to the federal felon-in-possession statute, *see* 18 U.S.C. § 922(g)(1), *Jackson* and *Cunningham* give "second-class" treatment to the Second Amendment. *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2156 (2022) (quoting *McDonald v. City of Chicago*, 561 U.S. 742, 780 (2010) (plurality opinion)). Even worse, they create a group of second-class citizens: felons who, for the rest of their lives, cannot touch a firearm, no matter the crime they committed or how long ago it happened. *See United States v. Cunningham*, 70 F.4th 502, 506 (8th Cir. 2023); *United States v. Jackson*, 69 F.4th 495, 501–02 (8th Cir. 2023). I dissent from the decision to deny rehearing en banc.

I.

*Jackson*, the first of the two opinions, fails to get the basics right. The Supreme Court told us last year that the burden is on "*the government* [to] demonstrate that the regulation"—here, the ban on possessing a firearm as a felon—"is consistent with this Nation's historical tradition of firearms regulation." *Bruen*, 142 S. Ct. at 2126 (emphasis added). Yet *Jackson* does not put the government to its task of establishing an "historical analogue." *Id.* at 2133 (emphasis omitted); *see Jackson*, 69 F.4th at 502.

-2-

Worse yet, *Jackson* actually flips the burden. It says that the *defendant*, not the government, must "show . . . that his prior felony conviction is insufficient to justify the" stripping of Second Amendment rights. *Jackson*, 69 F.4th at 506 n.4 (citation omitted). How can that be? Apparently one of our pre-*Bruen* cases says so. *See United States v. Adams*, 914 F.3d 602, 605 (8th Cir. 2019). It should go without saying that we have to follow what the Supreme Court says, even if we said something different before.

Other courts have done so. *See Range v. Att'y Gen. United States*, 69 F.4th 96, 98 (3d Cir. 2023) (en banc) (holding that "*the Government* did not carry its burden" in a similar case (emphasis added)); *id.* at 109 (Ambro, J., concurring) (recognizing "*the Government's* failure to carry its burden" (emphasis added)); *id.* at 113 (Schwartz, J., dissenting) (disagreeing with the majority because "*the Government* has presented sufficient historical analogues" (emphasis added)); *United States v. Daniels*, — F.4th —, 2023 WL 5091317, at *5 (5th Cir. Aug. 9, 2023) ("*[T]he government* has the burden to find and explicate the historical sources that support . . . constitutionality . . . ." (emphasis added)); *Atkinson v. Garland*, 70 F.4th 1018, 1019 (7th Cir. 2023) ("*[T]he government* bear[s] the burden of 'affirmatively prov[ing] that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms.'" (emphasis added) (quoting *Bruen*, 141 S. Ct. at 2127)); *see also United States v. Rahimi*, 61 F.4th 443, 450 (5th Cir. 2023), *cert. granted*, 143 S. Ct. 2688 (2023). Correcting a basic and fundamental error like this one was reason enough to grant rehearing.

The rest of *Jackson* shows why. From all appearances, it took the burden seriously, despite getting it backwards. Rather than conduct a probing examination of "historical[ly] analog[ous]" laws, *Bruen*, 142 S. Ct. at 2133 (emphasis omitted), it identified a few examples from a now-vacated Third Circuit decision and concluded that felons seem enough like Native Americans, slaves, Catholics, and Loyalists for Congress to disarm them too. *See Jackson*, 69 F.4th at 502–04 ("[H]istory supports the authority of Congress to prohibit possession of firearms by persons who have demonstrated disrespect for legal norms of society." (relying on

-3-

*Range v. Att'y Gen. United States*, 53 F.4th 262 (3d Cir. 2022), *vacated and reheard en banc*, 69 F.4th 96 (3d Cir. 2023)). It never really tells us why, perhaps because it thought it was the defendant's job to connect the dots.

Consider what flipping the burden does. When no one makes much of an effort to present historical evidence about a law's constitutionality, the government will always win. All sorts of firearms regulations will now be presumptively constitutional, with the burden falling on the regulated, not the regulator, to establish they are not. This error will affect our consideration of all types of laws, from age restrictions, *see Worth v. Harrington*, — F.Supp.3d —, 2023 WL 2745673, at *1 (D. Minn. March 31, 2023), and magazine-capacity limits, *see Or. Firearms Fed'n v. Kotek Or. All. for Gun Safety*, — F.Supp.3d —, 2023 WL 4541027, at *1 (D. Or. July 14, 2023), to permit requirements, *see id.* It is, in other words, "exceptionally importan[t]" to fix. Fed. R. App. P. 35(a)(2).

II.

Reversing the burden also lets *Jackson* avoid the sort of probing historical analysis *Bruen* requires. In particular, it makes no effort to draw the necessary connections between colonial-era laws and the felon-in-possession statute. Why were these particular groups targeted? What, if anything, does their disarmament have to do with felons? What lessons can we draw from the history? It is not as simple as saying some groups lost their arms, so felons should lose them too. After all, it goes without saying that we would not allow Congress to indiscriminately strip Catholics and Native Americans, two groups targeted by colonial-era disarmament laws, of their guns today.

There is, unsurprisingly, more to the story. Early laws were about lessening the danger posed by armed rebellion or insurrection. *See Kanter v. Barr*, 919 F.3d 437, 457 (7th Cir. 2019) (Barrett, J., dissenting); Adam Winkler, *Gunfight* 115–16 (2011). Slave revolts, for example, were a constant threat in the decades leading up to the Revolution. *See* Herbert Aptheker, *American Negro Slave Revolts* 18–19 (5th

-4-

ed. 1987) (citing the "nearly unanimous agreement" among scholars that there was "widespread fear of servile rebellion" throughout the 18th century (footnote omitted)); *id.* at 162–208 (describing attempted slave revolts from 1672 through 1791). Violent confrontations with Native Americans were also a concern, especially in frontier states like Pennsylvania and Virginia. *See Kanter*, 919 F.3d at 458 (Barrett, J., dissenting) ("Native Americans . . . were thought to pose more immediate threats to public safety and stability and were disarmed as a matter of course."). Disarmament laws targeted these two groups, in other words, because they were dangerous. *See Atkinson*, 70 F.4th at 1035 n.2 (Wood, J., dissenting) (cataloging laws disarming Native Americans).

The same goes for Catholics. Catholic men could possess firearms for most of the colonial era, yet Pennsylvania, Maryland, and Virginia took them away for about a decade. *See* Act of January 1757, *reprinted in* 5 *The Statutes at Large of Pennsylvania from 1682 to 1801*, at 608–09 (James T. Mitchell & Henry Flanders eds., n.p., WM Stanley Ray 1898); Act of May 1756, *reprinted in* 52 *Archives of Maryland: Proceedings and Acts of the General Assembly of Maryland, 1755-1756 (24)*, at 454 (J. Hall Pleasants ed., 1935); Act of March 1756, *reprinted in* 7 *The Statutes at Large; Being a Collection of All the Laws of Virginia From the First Session of the Legislature in the Year 1619*, at 35–39 (William Waller Hening ed., Richmond, Franklin Press 1820). All-important context makes clear that the goal was, once again, to prevent armed "rebellion" and "social upheaval[]." *Folajtar v. Att'y Gen. of the United States*, 980 F.3d 897, 914 (3d Cir. 2020) (Bibas, J., dissenting) (citation omitted); *see NRA v. Bureau of Alcohol, Tobacco, Firearms, and Explosives*, 700 F.3d 185, 200 (5th Cir. 2012) (observing that the colonies implemented these restrictions for "public[-]safety reasons"); *Daniels*, 2023 WL 5091317, at *11, 13.

Why were Catholics a concern? The answer is the French and Indian War, which took place from 1754 to 1763. It was an extension of the Seven Years War between Protestant England and Catholic France. *See* Nicholas J. Johnson, et al., *Firearms Law and the Second Amendment: Regulation, Rights, and Policy* 115–16

-5-

(1st ed. 2012). Protestant colonial governments feared that loyalty to the Pope would cause Catholics to take up arms for France. As one prominent Presbyterian pastor put it, the colonies would suffer from "the horrid arts of . . . popish torture" if the Catholics kept their arms. Samuel Davies, *Religion and Patriotism the Constituents of a Good Soldier: A Sermon Preached to Captain Overton's Independent Company of Volunteers, Raised in Hanover County, Virginia*, *August 17, 1755*, at 2 (Philadelphia, James Chattin 1755).

The fear was nothing new. Following the toppling of a Catholic monarch in England, King James II, many feared that Catholics might try to rebel against William and Mary, the country's new Protestant monarchs. *See* An Act for the Better Securing the Government by Disarming Papists and Reputed Papists, 1 W. & M., Sess. 1, ch. 15 (Eng. 1688); *see also* Johnson, et al., *supra*, at 90–91 (explaining the long history of Protestant and Catholic discontent in England). These suspicions materialized in repeated and often bloody Jacobite rebellions against the English Crown. *See* Geoffrey Plank, *Rebellion and Savagery: The Jacobite Rising of 1745 and the British Empire* 4–5 (2006). The disarming of Catholics in England and Ireland became routine throughout the 18th century because of the risk of guerrilla violence and the lingering threat of a Catholic restoration. *See* Johnson et al., *supra*, at 240.

Religious tension in the colonies was not nearly as intense as in Europe, but as the prospect of war rose, so did anti-Catholic sentiment. Maryland's Committee of Grievance and Courts of Justice, for example, alleged in 1753 that Catholics had plotted "towards carrying on the Rebellion against King George," among other acts of treachery. 50 *Archives of Maryland*, *supra*, at 201. This report, along with an accompanying wave of anti-Catholic bias, led the Maryland Legislature to pass a law stripping them of their arms in 1756. *See* 52 *Archives of Maryland*, *supra*, at 454.

Pennsylvania and Virginia disarmed Catholics around the same time. "[A]ctual war with the French King and his subjects" and the possibility of "intestine

-6-

Appellate Case: 22-2870     Page: 6     Date Filed: 08/30/2023 Entry ID: 5311696

commotions, rebellions, or insurrections" led both states down this path. 5 *The Statutes at Large of Pennsylvania*, *supra*, at 609; *see* 7 *The Statutes at Large; Being a Collection of All the Laws of Virginia*, *supra*, at 35 (explaining that "it is dangerous at this time to permit Papists to be armed"). In fact, the Pennsylvania disarmament statute tied the "papist" prohibition to the war effort: it allowed the "colonel of the regiment within whose district the arms [were] found" to take them for "public use." 5 *The Statutes at Large of Pennsylvania*, *supra*, at 627. Confiscated arms were then redeployed in the fight against France.

A similar pattern emerged with the Loyalists during the Revolutionary War. States like Virginia and Pennsylvania required men above a certain age to swear a "loyalty oath" to the revolutionary cause. *See* Act of June 13, 1777, § 1, *reprinted in* 9 *The Statutes at Large of Pennsylvania*, *supra*, at 110–11. Refusal to do so would result in the loss of arms. *See id.* at 111–13 (explaining that those who fail to take the oath "renounc[ing] and refus[ing] all allegiance to King George . . . shall be disarmed").

Loyalists, just like the other groups discussed above, posed a danger. People who could not pledge allegiance were likely to aid the British, or possibly even join their ranks. *See* Mark Mayo Boatner III, *Encyclopedia of the American Revolution* 663 (1st ed. 1966) (discussing the nearly 50,000 colonists who fought for the British). And then they could use their arms to kill others, including their fellow citizens. *See Kanter*, 919 F.3d at 457 (explaining that people who failed to take an oath were a "potential threat" to the revolutionary cause (citation omitted)); *Daniels*, 2023 WL 5091317, at *13. Oaths were meant to reduce the danger before the threat materialized into something more.

Practices shortly after the Founding are consistent with the dangerousness rationale. *See Bruen*, 142 S. Ct. at 2136–37 (discussing the concept of "liquidation"). Of the states that protected the right to keep and bear arms, *none* disarmed non-dangerous felons. *Cf. Handbook on the National Conference of Commissioners on Uniform State Laws and Proceedings of the Thirty-Fifth Annual*

*Meeting* 862–63 (1925) (cataloging the earliest felon-in-possession laws in the states). You read that right, none.

Even violent felons, as a class, were not disarmed until the early 20th century, nearly 150 years later. *See* Federal Firearms Act, ch. 850, §§ 1(6), 2(e), 2(f), 52 Stat. 1250, 1250–51 (1938). And it was only in 1961, just 62 years ago, that the federal government finally abandoned dangerousness as the litmus test for disarmament in enacting § 922(g)(1)'s predecessor. *See* An Act to Strengthen the Federal Firearms Act, Pub. L. No. 87-342, 75 Stat. 757 (1961); *see also Range*, 69 F.4th at 104. There is nothing about felon-dispossession laws that is longstanding, unless six decades is long enough to establish a "historical tradition" of the type contemplated by *Bruen*. Spoiler alert: it is not. *See Bruen*, 142 S. Ct. at 2156 (holding unconstitutional a century-old licensing regime).

In sum, the decades surrounding the ratification of the Second Amendment showed a steady and consistent practice. People considered dangerous lost their arms. But being a criminal had little to do with it.

### III.

*Jackson*'s cursory historical analysis does not establish otherwise. I start with a discussion of the so-called "virtue theory" of the Second Amendment, followed by a deep dive into its ratification history.

### A.

*Jackson* suggests that "citizens who are not 'law-abiding'" permanently lose their right to keep and bear arms, "whether or not they ha[ve] demonstrated a propensity for violence." *Jackson*, 69 F.4th at 502 (citation omitted); *see id.* at 504 (allowing the disarming of anyone who has "disrespect for the legal norms of society"); *see also Range*, 69 F.4th at 118 (Krause, J., dissenting). The virtue theory views bearing arms as a "civic right" for only the virtuous. *Folajtar*, 980 F.3d at

-8-

Appellate Case: 22-2870   Page: 8   Date Filed: 08/30/2023 Entry ID: 5311696

914 (Bibas, J., dissenting) (debunking the scholarship that supports this position). Felons, being felons, do not fall into that category, so they lose the right. *Id.*

The problem is that nothing in the Second Amendment's text supports such a restrictive interpretation. The right to bear arms belongs to "the people"—the virtuous, the non-virtuous, and everyone in between. U.S. Const. amend. II; *District of Columbia v. Heller*, 554 U.S. 570, 580 (2008) ("'[T]he people' . . . unambiguously refers to all members of the political community, not an unspecified subset."); *Range*, 69 F.4th at 101–02 (making this point).

History is just as definitive on this point. Consider Catholics, who had long been persecuted for their perceived lack of virtue. *See, e.g.*, The Toleration Act of 1688, 1 W. & M., ch. 18. They did not suddenly lose their guns because society viewed them as unvirtuous. Rather, the tipping point was an "actual war" with a Catholic nation, which created a risk that Catholics would sympathize with the French, our enemy, and engage in "rebellion[] or insurrection[]." 5 *The Statutes at Large of Pennsylvania*, *supra*, at 609.

The virtue theory also suffers from an even more glaring flaw. If felon disarmament is so obviously constitutional, then why were there "no [Founding-era] laws . . . denying the right [to keep and bear arms] to people convicted of crimes"? *Binderup v. Att'y Gen. United States*, 836 F.3d 336, 368–69 (3d Cir. 2016) (Hardiman, J., concurring) (citation omitted). After all, *Bruen* tells us to find a "historical analogue" and the most obvious one—disarming felons—did not exist in the colonies or early American states. *Jackson* tries to explain why: the standard penalty for felonies was death, and dead men don't need guns. *See Jackson*, 69 F.4th at 503 (explaining that the "punishments . . . subsumed disarmament"); *Medina v. Whitaker*, 913 F.3d 152, 158 (D.C. Cir. 2019) (making the same point).

There are several flaws with this explanation, the first being that it rests on a faulty assumption. Not all felonies were punishable by death, particularly the non-dangerous ones. *See* An Act for the Punishment of Certain Crimes Against the

United States, ch. 9, §§ 2, 6, 21, 1 Stat. 112, 112–17 (1790) (creating various term-of-years sentences for nonviolent felonies, such as "misprision" and "bribery"); 2 *The Works of James Wilson* 348 (James DeWitt Andrews ed., Chicago, Callaghan and Company 1896) (explaining that felonies no longer required the death penalty by the time of the Founding); 6 Nathan Dane, *A General Abridgment and Digest of American Law, With Occasional Notes and Comments* 715 (Boston, Cummings, Hilliard & Co. 1824) (noting that "but a very few" felonies were punishable by death); *see also Kanter*, 919 F.3d at 458–62 (Barrett, J., dissenting) (discussing how the concept of "civil death" did not apply after felons had served their sentence). Even many first-time violent offenders escaped the death penalty through the "benefit of clergy," including the famous case of two British regulars who were convicted of manslaughter for their role in the Boston Massacre. *See* Jeffrey Sawyer, *"Benefit of Clergy" in Maryland and Virginia*, 34 Am. J. Legal Hist. 49, 49–50 (1990). *Jackson*'s greater-includes-the-lesser argument cannot be right if the greater—the widespread use of death as the punishment for a felony—was itself a fiction.

The second problem is that the argument only works if the greater and the lesser were both punishments for committing a crime. It turns out, however, that disarmament was never one. Death, peace bonds, whippings, hard labor, and prison time were among the punishments available, but conspicuously missing was any dispossession of firearms, much less a lifetime ban on owning them. *See, e.g.*, Act of March 18, 1796, *reprinted in* Laws of the State of New-Jersey; Revised and Published under the Authority of the Legislature 245 (Trenton, Joseph Justice 1821) (punishing manslaughter with a fine or imprisonment and hard labor); Paul Lermack, *Peace Bonds and Criminal Justice in Colonial Philadelphia*, 1976 Pa. Mag. of Hist. & Biography 173, 187 (cataloging the use of peace bonds for felonies).

Third, to the extent *Jackson* characterizes forfeiture of arms as a common non-capital punishment, it only covered firearms used in the actual commission of a crime. The most common examples were non-violent hunting offenses. *See, e.g.*, Act of Apr. 20, 1745, *reprinted in* 23 *The State Records of North Carolina* 218–19

-10-

(Walter Clark ed. 1904); Act of Oct. 9, 1652, *reprinted in* E. B. O'Callaghan, *Laws and Ordinances of New Netherland 1638–1694*, at 138 (Albany, Weed, Parsons and Company, 1868). Another was "Terror of the People"—an ancient offense prohibiting the use of a weapon to terrorize others. George Webb, *The Office of Authority of a Justice of the Peace* 92–93 (Williamsburg, William Parks 1736) (discussing Virginia law); *see* An Act for the Punishing of Criminal Offenders, ch. 11, § 6 (1692), *reprinted in* The Charters and General Laws of the Colony and Province of Massachusetts Bay 237, 240 (Boston, T.B. Wait & Co. 1814); Statute of Northampton, 2 Edw. 3, c. 3 (1328) (requiring forfeiture, among other punishments).

The fact that the state took away a specific firearm does not, as *Jackson* suggests, support the constitutionality of a blanket ban. *Cf. Range*, 69 F.4th at 105. Nothing prevented individual offenders, even those who had forfeited a gun, from buying another.[1] As *Bruen* reminds us, "if earlier generations addressed [a] societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional." 142 S. Ct. at 2131. The forfeiture of a specific gun certainly qualifies as a "materially different means" than stripping a person of the right to keep and bear arms for a lifetime. *Id.*

The fourth and final point takes us right back to the start: if *Jackson* is right, then the government can presumably strip felons of other core constitutional rights too. *See Range*, 69 F.4th at 101–02. Dead men do not speak, assemble, or require protection from unreasonable searches and seizures, so those must be rights belonging to the "people" that anyone who "demonstrate[s] disrespect for legal norms of society," *Jackson*, 69 F.4th at 504, can forfeit too. *See* U.S. Const. amends. I, IV; *Range*, 69 F.4th at 101–02; *cf. Bruen*, 142 S. Ct. at 2130 (explaining that courts should treat the Second Amendment like other enumerated rights). Or perhaps we

---

[1] Forfeiture has a longstanding pedigree in English and American law. *See Austin v. United States*, 509 U.S. 602, 613–14 (1993) (discussing the history). But it never extended to every firearm a person owned.

-11-

Appellate Case: 22-2870   Page: 11   Date Filed: 08/30/2023   Entry ID: 5311696

can try felonies without a jury because they were once punishable by death. *See* U.S Const. amend. V; *Kanter*, 919 F.3d at 462–63 (Barrett, J., dissenting) (highlighting the absurdity of this position); *Folajtar*, 980 F.3d at 920–21 (Bibas, J., dissenting) (same).

It is true that early American legislatures did take away some "civic" rights from felons. Chief among them were voting, sitting on a jury, and holding office. *See* Alexander Keyssar, *The Right to Vote: The Contested History of Democracy in the United States*, 62–63 & tbl. A.7 (2000). But they did so explicitly, sometimes even by constitutionalizing the restrictions. *See id.* (listing which states disenfranchised felons in the decades after the Founding). One would expect to see similar laws stripping criminals of the right to bear arms. *Cf.* An Act for the Punishment of Certain Crimes Against the United States, Ch. 9, § 21, 1 Stat. 117 (1790) (proclaiming that a person convicted of bribery "shall forever be disqualified to hold any office of honour, trust or profit under the United States"). Yet there were none, a conspicuous absence for a supposedly "longstanding" government power. *Jackson*, 69 F.4th at 502.

B.

*Jackson* has no more success drawing from the Second Amendment's ratification history than it does in its search for an "historical analogue." *See Jackson*, 69 F.4th at 503. Five proposals on the right to bear arms came out of state ratifying conventions. 1 *Debates in the Several State Conventions on the Adoption of the Federal Constitution* 326, 328, 335 (Jonathan Elliot ed., 2d ed. Washington, D.C., 1836) (New Hampshire, New York, and Rhode Island); 2 Bernard Schwartz, *The Bill of Rights: A Documentary History* 665, 681 (1971) (Massachusetts and Pennsylvania). Two do not address criminality at all, so they provide no support for the virtue theory. *See* 1 *Debates in the Several State Conventions*, *supra*, at 328, 335 (identifying New York and Rhode Island as proposing "[t]hat the people have a right to keep and bear arms"). Only the other three are remotely relevant. *See Kanter*, 919 F.3d at 454 (Barrett, J., dissenting); *see also Folajtar*, 980 F.3d at 915, 919–20

-12-

(Bibas, J., dissenting) (referencing the Pennsylvania proposal as the "only piece of historical evidence that comes close to endorsing a ban of all former felons").

The most famous of the three, and the only one *Jackson* cites, is the "Dissent of the Minority," a proposal from a group of Pennsylvania Anti-Federalists. 2 Schwartz, *supra*, at 662, 665. It would have guaranteed, among other things, the right to keep and bear arms "unless for crimes committed, or real danger of public injury from individuals." *Id.* Of course, being a dissent published by a "Minority," it does not reflect what was ultimately ratified, a point *Jackson* seems to miss. Indeed, it did not even garner a majority of the votes of the Pennsylvania delegation, much less the country as a whole.

Indeed, the Second Amendment bears little resemblance to what the Pennsylvania Anti-Federalists wanted it to say. *Compare* U.S. Const. amend. II ("A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."), *with* 2 Schwartz, *supra*, at 665 ("[T]he people have a right to bear arms for the defence of themselves . . . and no law shall be passed for disarming the people or any of them unless for crimes committed, or real danger of public injury from individuals . . . ."); *see also United States v. Skoien*, 614 F.3d 638, 648 (7th Cir. 2010) (en banc) (Sykes, J., dissenting) (emphasizing the textual differences). The most obvious difference is the absence of any language saying who can lose the right. *Id.* In fact, the absence of anything on that point, over the dissent of one "influential" faction, suggests that any mention of criminality was intentionally left out. *Heller*, 554 U.S. at 604; *see also* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 107–11 (2012) (describing the negative-implication canon).

The last two proposed amendments tell us even less. The Massachusetts proposal, advanced by Samuel Adams, would have restricted the power of the government to strip "the people of the United States, who are peaceable citizens, from keeping their own arms." 2 Schwartz, *supra*, at 675, 681. Like the Dissent of the Minority, however, it failed to win a majority vote of the state's delegates. And

-13-

even if it had, "peaceable" is just a synonym for non-dangerous, which suggests that, like the Pennsylvanians who wanted to add "real danger," the Massachusetts delegates understood that dangerousness was what mattered. *Kanter*, 919 F.3d at 455–56 (Barrett, J., dissenting) (analyzing early dictionary definitions to conclude that "peaceable citizens" were "not violent . . . bloody . . . quarrelsome . . . [or] turbulent" (brackets and citations omitted)).

The only somewhat-relevant ratifying proposal that carried a majority at a state convention was from New Hampshire. Its focus was on the *dangerousness* posed by rebellion: "Congress shall never disarm any citizen, unless such as are or have been in actual rebellion." 1 *The Debates in the Several States*, *supra*, at 326. Making no mention of *other* crimes, it simply reinforces the importance of dangerousness.

*       *       *

Disarmament is about dangerousness, not virtue. We know that because colonial and post-ratification gun laws targeted rebellion and insurrection, not criminality. There have always been criminals, but there is no suggestion in any "historical analogue" that criminality alone, unaccompanied by dangerousness, was reason enough to disarm someone. *Bruen*, 142 S. Ct. at 2133 (emphasis omitted). And history certainly does not support *Jackson*'s unbending rule that felons can *never* win an as-applied challenge, no matter how non-violent their crimes may be or how long ago they happened.

IV.

Perhaps recognizing the weakness of the virtue theory, *Jackson* suggests that § 922(g)(1) passes constitutional muster anyway "as an effort to address a risk of dangerousness." *Jackson*, 69 F.4th at 504. But early American legislatures did not arbitrarily classify a group of people as dangerous and then offer no way to prove otherwise. *See Range*, 69 F.4th at 105; *Kanter*, 919 F.3d at 465 (Barrett, J.,

-14-

dissenting) ("The government could quickly swallow the right if it had broad power to designate any group as dangerous and thereby disqualify its members from having a gun.").

Rather than disarm everyone who might aid the enemy in wartime, the colonists devised a way to determine who was dangerous and who was not: loyalty oaths. Suspected Catholic insurgents in Virginia, for example, could keep their guns if they "sw[ore] undivided allegiance to the sovereign." *See Kanter*, 919 F.3d at 457 (Barrett, J., dissenting) (citation omitted). The same went for suspected Loyalists during the Revolutionary War. *See Daniels*, 2023 WL 5091317, at *11 n.30; *Range*, 69 F.4th at 124–26 (Krause, J., dissenting). Loyalty oaths were a way to tell who might start a rebellion or raise arms against others. They also gave individuals a way to show they were not as dangerous as the government thought.

They were not perfect. Sometimes they were underinclusive. Benedict Arnold's loyalty oath, for example, did not reveal his treachery. *See* Benedict Arnold's Oath of Allegiance (May 30, 1778) (on file with the National Archives). Other times they were overinclusive. A Pennsylvania law allegedly swept up non-dangerous pacifists like the Quakers, whose religion prohibited both violence and oath taking.[2] *See Jackson*, 69 F.4th at 504 (arguing that some people who refused

---

[2]It is unclear whether many Quakers were actually disarmed in Pennsylvania or other loyalty-oath states. They were only forbidden from taking oaths, after all, and many of the relevant laws, including one of the statutes *Jackson* cites, allowed people to "affirm" or "declare" their loyalty instead. Act of June 13, 1777, ch. 756, § 1, *reprinted in* 9 *The Statutes at Large of Pennsylvania from 1682–1801*, *supra*, at 110–111; Act of June 1776, *reprinted in* 7 *Records of the Colony of Rhode Island and Providence Plantations in New England* 566–67 (John Russell Bartlett ed., Providence, A. Crawford Greene 1862). Other states expressly exempted Quakers from their loyalty-oath requirements. *See* Act of May 1, 1776, ch. 21, § 8, *reprinted in* 5 *The Acts and Resolves, Public and Private, of the Province of the Massachusetts Bay* 483 (Boston, Wright & Potter Prtg. Co. 1886).

-15-

Appellate Case: 22-2870     Page: 15     Date Filed: 08/30/2023 Entry ID: 5311696

the oath were not dangerous); *Range*, 69 F.4th at 125 (Krause, J., dissenting); *cf. Heller*, 554 U.S. at 590 ("Quakers opposed the use of arms not just for militia service, but for any violent purpose whatsoever . . . ."); 4 *Journals of the Continental Congress*, *1774-1789*, at 205 (Worthington Chauncey Ford ed., 1906).

As imperfect as they were, loyalty oaths still identified dangerous people. Whenever anyone refused to pledge their loyalty, particularly during wartime or societal unrest, it raised the possibility that their sympathies laid elsewhere. *See* 5 *The Acts and Resolves*, *supra*, at 479–84 (disarming each man older than 16 who refused to sign a loyalty oath and requiring the "strictest search" of his possessions). And the risk was that they would pose a danger by raising arms against the government or their fellow citizens.

Felons, on the other hand, are different. Murderers are almost always dangerous. But people who utter obscenities on the radio, read another person's email, or open a bottle of ketchup in the store and "put[] it back on the shelf," not so much. *See Folajtar*, 980 F.3d at 921 (Bibas, J., dissenting). Yet § 922(g)(1) does not discriminate. And now, under *Jackson*, there is no recourse—not a loyalty oath or a challenge in court—to prove they pose no danger.

In the end, the argument for blanket disarmament of felons sounds like the type of absolutist argument that the Supreme Court rejected in *Bruen*. Just like the entire city of New York is not a "sensitive place," neither is every felon "dangerous." Both classifications are "too broad[]." *Bruen*, 142 S. Ct. at 2134. In *Bruen*, the antidote was a court challenge. Here, *Jackson* puts even that cure out of reach. 69 F.4th at 502.

V.

*Jackson* is also wrong to think that *Heller* completely immunized felon-in-possession laws. To be sure, it did not "cast doubt" on their "*presumptive[] lawful[ness]*." 554 U.S. at 626, 627 n.26 (emphasis added). But *Heller* stopped

-16-

Appellate Case: 22-2870      Page: 16      Date Filed: 08/30/2023 Entry ID: 5311696

short of saying they are always constitutional, no matter the felon. After all, a measure can be presumptively constitutional and still have constitutionally problematic applications. As-applied challenges exist for exactly this reason. *See Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450–51, 457–58 (2008); *Atkinson*, 70 F.4th at 1022 ("Nothing allows us to sidestep *Bruen* in the way the government invites.").

Besides, *Heller* itself had a different focus: it took on the centuries-old debate about whether the Second Amendment creates an individual or collective right. 554 U.S. at 577. It did not adopt a test for Second Amendment challenges, much less decide whether felon bans are constitutional. *See Skoien*, 614 F.3d at 640 (explaining that *Heller* "left open" this issue). And if anything, it undermined the case for the virtue theory by making clear that the right to keep and bear arms is an "individual," *Heller*, 554 U.S. at 598, rather than a "civic right," *Kanter*, 919 F.3d at 446 n.6 (discussing the scholarship that supports a "civic[-]right" conception of the Second Amendment). *See Heller*, 554 U.S. at 580 ("Nowhere else in the Constitution does a 'right' attributed to 'the people' refer to anything other than an individual right." (quoting U.S. Const. amend. II)). The two are mutually exclusive. *See Binderup*, 836 F.3d at 370–72 (Hardiman, J., concurring in part).

*Jackson* also seeks refuge in the various separate opinions in *Bruen*. *See Jackson*, 69 F.4th at 502 (citing Justice Alito's concurrence, Justice Kavanaugh's concurrence, and Justice Breyer's *dissent* as "assurances" that *Bruen* did not "cast doubt" on longstanding felon bans); *Cunningham*, 70 F.4th at 506 (same). But just as New York's licensing regime was not before the Court in *Heller*, neither was § 922(g)(1) before the Court in *Bruen*. *See Bruen*, 142 S. Ct. at 2157 (Alito, J., concurring) ("[T]oday's decision therefore holds that a State may not enforce a law[] like New York's Sullivan Law . . . . That is all we decide."). Reading the tea leaves from dicta in three separate opinions is no substitute for faithful application of a majority opinion that commanded six votes. *See Oklahoma v. Castro-Huerta*, 142

S. Ct. 2486, 2498 (2022) ("[D]icta, even if repeated, does not constitute precedent . . . .").

## VI.

Perhaps the driving force behind *Jackson* is prudence and practicality, not text or history. The court is worried about what "felony-by-felony" litigation will look like and whether the new post-*Bruen* world will be judicially manageable. *Jackson*, 69 F.4th at 502 & n.2. But the biggest questions all have simple answers. What is the standard? Dangerousness. When will it happen? When a defendant raises an as-applied challenge. What will it look like? The parties will present evidence and make arguments about whether the defendant is dangerous. The truth is that it will look almost the same as other determinations we ask district courts to make every day.

It is not as if assessing dangerousness is foreign. District courts considering whether to release a defendant before trial must consider whether it would "endanger the safety of any other person or the community." 18 U.S.C. § 3142(b). And then at sentencing, dangerousness comes up at least twice. The first is when balancing the statutory sentencing factors, including the need "to protect the public." *Id.* § 3553(a)(2)(C). The second is even a closer match: determining whether a defendant must "refrain from possessing a firearm" while on probation or supervised release. *Id.* § 3563(b)(8) (allowing a judge to impose numerous conditions on probation, such as "refrain[ing] from possessing a firearm, destructive device, or other dangerous weapon"); *id.* § 3583 (allowing a judge to impose, if "reasonably related" to the sentencing factors, "any condition set forth as a discretionary condition . . . in section 3563(b)"). It is not clear why making one more determination along those same lines, perhaps even on the same facts, would be so difficult.[3]

---

[3]Besides, difficulty of administration is no excuse for failing to follow Supreme Court precedent. *See, e.g.*, *Brown v. Bd. of Educ.*, 349 U.S. 294, 298 (1955).

-18-

We also do not have to look far to learn that "felony-by-felony" litigation is nothing to fear. *Jackson*, 69 F.4th at 502. Over a decade before *Bruen*, the Third Circuit explained that a successful as-applied challenge to a § 922(g)(1) conviction required the defendant to "present facts about himself and his background that distinguish his circumstances from those of persons historically barred from Second Amendment protections." *United States v. Barton*, 633 F.3d 168, 174 (3d Cir. 2011). Substitute the word "dangerousness" and shift the burden of proof to the government, and *Barton* provides the template for what an as-applied challenge looks like post-*Bruen*.

It should come as no surprise that district courts around the Third Circuit had no trouble handling the task. They considered basic facts in making the determination, including a felon's criminal history, behavior on probation, and history of violence in evaluating whether gun possession posed a danger to the community. *Suarez v. Holder*, 255 F. Supp. 3d 573, 585–89 (M.D. Pa. 2015); *Binderup v. Holder*, 2014 WL 4764424, at *21–31 (E.D. Pa. Sept. 25, 2014), *aff'd*, 836 F.3d 336 (3d Cir. 2016). Exactly what they already do pretrial and at sentencing. We just need to trust judges to do it one more time. *See, e.g.*, *United States v. Banderas*, 858 F.3d 1147, 1150 (8th Cir. 2017) ("The [district] court reasonably concluded that [the defendant] was 'potentially a very dangerous person . . . .'").

VII.

These issues are "exceptional[ly] importan[t]." Fed. R. App. P. 35(a)(2). Felon-in-possession cases are common in federal court. And *Jackson*'s holding doing away with as-applied Second Amendment challenges is an outlier. *See Atkinson*, 70 F.4th 1023–24; *Range*, 69 F.4th at 106. Even the case *Jackson* pinned its historical analysis on, *Range*, has now gone the other way. *Compare Range*, 53

-19-

F.4th 262, *with Range*, 69 F.4th 96 (en banc). En-banc votes do not come much easier than this one. I would grant.

_____

August 30, 2023

Order Entered at the Direction of the Court:
Clerk, U.S. Court of Appeals, Eighth Circuit.
_____
/s/ Michael E. Gans